UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DIANNE JOHNSON, JEFFREY JOHNSON,
LYNNE JOHNSON, PAUL JOHNSON,           CASE NO. 99-8228-CIV-RYSKAMP
PATRICIA WELLSPEAK, SHARON PRATT,
LAWRENCE PRATT AND
WARREN JOHNSON, SR.,

     Plaintiffs/Counter-Defendants,

vs.

ICE BAN AMERICA, INC. AND
IBAC CORPORATION,

     Defendants/Counter-Plaintiffs,

vs.

SONEET KAPILA, TRUSTEE, ADAM BROWN,
KELLY BROWN, MARK JOHNSON, HARBOUR
FUNDING PARTNERS, MEDICAL COLLEGE
FUND, LTD., WINDMILLS PLANTATION FUND,
LTD., HAWK'S NEST PLANTATION FUND, LTD.,
REED INTERNATIONAL FUND, LTD., RYDER
SECURITIES, LTD., MARLIN PRESERVATION
FUND, LTD., HARVARD FUND LIMITED,
MERCHANT TRUST FUND LIMITED, and GRAND
TURK HARBOUR DEVELOPMENTS LIMITED,
MICHAEL BALL, BURTON WICKHAM, STEVE
RUBENS, T. LEONARD FISHER AND DIANNE
JOHNSON as TRUSTEE for the JOHNSON FAMILY
TRUST.

     Additional Counter-Defendants.

_____/

## COUNTERCLAIM OF ICE BAN AMERICA, INC. AND IBAC CORPORATION

     Defendants/Counter-Plaintiffs, Ice Ban America, Inc. and IBAC Corporation (hereinafter

collectively "Ice Ban"), file this Compulsory Counterclaim against Plaintiffs/Counter-Defendants,

Dianne Johnson, Jeffrey Johnson, Lynne Johnson, Paul Johnson, Patricia Wellspeak, Sharon Pratt,

WP023983;1

Lawrence Pratt and Warren Johnson, Sr. and against Additional Counter-Defendants, Soneet Kapila, Trustee, Adam Brown, Kelly Brown, Mark Johnson, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, Grand Turk Harbour Developments Limited, Michael Ball, Burton Wickham, Steve Rubens, T. Leonard Fisher,  and the Johnson Family Trust through Dianne Johnson as it's Trustee.

## VENUE AND JURISDICTION

1.      The Court has jurisdiction over the Plaintiffs/Counter-Defendants and venue is proper in the Southern District of Florida since the counter claims set forth herein are compulsive (see Merrill lynch, Pierce, Fenner and Smith, inc., v. Del Valle, S.D. Fla. 1981, 528 F. Supp. 147.)

2.      This Court has jurisdiction over the Additional Counter-Defendants as follows:

A.      Soneet Kapila, Trustee, is the Bankruptcy Trustee for Warren D. Johnson, Jr. ("Johnson, Jr.") in Case No. 92-33339-BKC-SHF, and is sued only in his representative capacity as Trustee and because he has a claim to the stock obtained in transactions sought to be rescinded by this action, and, as Trustee, has all rights of Johnson, Jr. and the Johnson Family Trust. Kapila, Trustee, is not being sued for any of his conduct or actions, but merely in his representative capacity.

B.      Counter Defendant  Adam Brown is Johnson, Jr.'s son-in-law, and the husband of the Counter Defendant  Kelly Brown, and both are residents of Florida.

C.      The Counter Defendant  Mark Johnson is Johnson, Jr.'s son, and a resident of Florida.

D.      The  Counter Defendant  Harbour Funding Partners is a Nevada limited partnership, as to which Charter Media Group, Ltd., is the corporate general partner, and does business in or claims assets held in Florida.

E.      The Counter Defendants Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Next Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., and Marlin Preservation Fund, Ltd. are companies registered under the laws of the Turks and Caicos Islands, and does business in or claims assets held in Florida.

F.      The Counter Defendant  Harvard Fund Limited is a corporation incorporated under the laws of the nation of Nevis, and does business in or claims assets held in Florida.

G.      The Counter Defendant  Merchant Trust Fund, Ltd. is a corporation incorporated under the laws of the nation of Nevis, and does business in or claims assets held in Florida.

H.      The Counter Defendant  Grand Turk Harbour Developments Limited ("GTH") is a corporation, the directors of which are Richard Grund, Gerald Bourne and Andrew Honeycut, and does business in or claims assets held in Florida.

I.      Counter Defendants, Michael Ball and T. Leonard Fisher, reside and do business in Martin County, Florida.

J.      Counter Defendant, Burton Wickham, resides in Canada, but does business in or claims assets held in Florida.

K.     Counter Defendant, Steve Rubens, resides in New York at 8 Vantage Drive, Pittsford, New York, 14534, does business in, and claims assets located in Florida.

## GENERAL ALLEGATIONS - ALL COUNTS

### I.     JOHNSONS SEE AN OPPORTUNITY

3.     In early 1994, George Janke ("Janke") learned of an opportunity to acquire all right, title and interest in an existing U.S. patent for the use of a specific residue product for the deicing of roads.  This opportunity was presented to Janke by Karl and Barbara Ronaszeki ("Ronaszekis").

4.     At the time of receiving this opportunity from the Ronaszekis, Janke had been engaged in a long-running real estate development business with Warren Johnson, Jr. ("Johnson, Jr."), which business was in litigation and was one of the stated reasons cited by Johnson, Jr. in his recently filed bankruptcy.  Due to the financial misfortunes of Johnson, Jr. and, concurrently, the Johnson Family consisting of Johnson, Jr.'s wife, Dianne Johnson; his father, Warren Johnson, Sr.; his brothers, Jeffrey and Paul Johnson; his sisters, Sharon Pratt and Patricia Wellspeak; Jeff's spouse, Lynne Johnson, and Sharon's spouse, Lawrence Pratt; his son-in-law and daughter, Adam and Kelly Brown; and his son, Mark Johnson (hereinafter collectively "Johnson Family"), Janke decided to offer Johnson, Jr. and the Johnson Family an opportunity to participate in what Janke believed had the potential to be a highly profitable business.

5.     Janke offered Johnson, Jr. and the Johnson Family an opportunity to be an equal partner with Janke in the development and acquisition of patents for the use of agricultural

products, byproducts, residues for commercial and industrial use in the deicing or stabilization of roadways.

6.      Unbeknownst to Janke, and other early participants in what later came to be known as the "Ice Ban business," Johnson, Jr. and the Johnson Family saw Janke's invitation as an opportunity to begin an overall scheme of fraudulent activities to the benefit of Johnson, Jr. and the Johnson Family and to the severe detriment of Janke and the corporate entities that would later be known as Ice Ban America, Inc., now Natural Solutions Corporation, and IBAC Corporation.

## II.    JOHNSONS USE OF ECOLOGICAL SNOW CONTROL, INC. AND ICE BAN, INC. (NEW YORK) TO LAUNDER MONEY OBTAINED BY WARREN JOHNSON, JR. IN A BANKRUPTCY FRAUD

7.      Janke and Johnson, Jr. initially planned to establish a Florida corporation, Ecological Snow Control, Inc. ("Eco-Sno") to develop a business based upon the patent rights to be acquired, and to develop patents having to do with de-icing and road stabilization. This corporation was formed on Sept., 27, 1994 with George Janke as President as Johnson Jr. as Vice President.

8.      Subsequently, Dianne Johnson, together with other members of the Johnson Family, to-wit, Jeff Johnson, Paul Johnson, Wellspeaks, and Pratts, formed Ice Ban, Inc., a New York corporation (hereinafter "Ice Ban (NY)").  Dianne Johnson, purporting to act on behalf of Eco-Sno but with no authority from Eco-Sno, signed an exclusive license agreement with Ice Ban (NY), with Jeff Johnson acting as the President of Ice Ban (NY).

9.      The actual purpose of the purported transaction between Dianne Johnson and Jeff Johnson and the Johnson Family in Ice Ban (NY) was to cover up a trail of money laundering by

Johnson Jr. The purpose of the money laundering scheme was to conceal certain assets from the bankruptcy court in a fraud scheme by Johnson Jr. with the assistance of his family.

10.     Details of the bankruptcy fraud are set forth in the indictment in the case of <u>U.S.A.</u> <u>v. Warren D. Johnson, Jr.</u>, Case No. 98-8039-CR-Ryskamp, Southern District of Florida, in which Johnson, Jr. was found guilty by a jury verdict on November 25, 1998, and sentenced to 97 months in prison on June 23, 1999.  A true copy of the indictment is attached hereto as Exhibit "1" attached hereto and incorporated herein by reference. Further the court found that the Johnson Family were fiduciaries of Johnson Jr., in regards to their holdings of certain assets, including Ice Ban America and IBAC stock.

11.     The Johnson Family was aware of the money laundering activities of Johnson Jr. and actively participated with Johnson Jr. in using the unauthorized exclusive distributorship agreement between Eco-Sno and Ice Ban (NY) for the purpose of laundering the proceeds from the sale of Johnson Jr's assets in furtherance of a bankruptcy fraud, from Johnson Jr. to Johnson, Sr., and on to Dianne Johnson, and then  to Ice Ban (N.Y.).

12.     On June 25, 1999, the Bankruptcy Trustee, Soneet Kapila filed an adversary complaint against Johnson, Jr. and the Johnson Family to void and recover the fraudulent transfers, and U.S. Bankruptcy Court Judge Steven H. Freidman entered an Order of Temporary Injunction enjoining Johnson, Jr. and the Johnson Family from conveying or disposing of all assets.  True copies of the Complaint and Injunction are attached hereto as Exhibits "2" and "3" attached hereto and incorporated herein by reference.

## III.    JOHNSONS CREATE FRAUDULENT BANK ACCOUNTS AND FALSE FINANCIAL STATEMENTS OF ICE BAN, INC.

13. Shortly after forming Ice Ban (NY), the Johnson Family began establishing fictitious bank accounts in the name of Ice Ban (NY) in various places around the country, including but not limited to Riverside Bank in Fort Pierce, Florida.

14. Such fictitious bank accounts of Ice Ban (NY) served no business purpose for Ice Ban (NY), but were established solely for the purpose of having an account in the name of "Ice Ban" at which place checks could be deposited which were meant for Ice Ban America. Such accounts were used, as will be described later, as a part of an overall scheme to defraud Ice Ban America and investors in Ice Ban America and to sell shares of stock in violation of the laws of the United States, the laws of Florida, and the rules and regulations of the Securities and Exchange Commission. Such bank accounts were kept "off the books" of Ice Ban (NY), and were never revealed to outside accountants and attorneys for Ice Ban (NY) and were not revealed to Ice Ban America. in July 1997, when Ice Ban America purchased all the stock of Ice Ban (NY). (Ice Ban America had actually changed its name to Natural Solutions but will continue to be called Ice Ban America throughout the pleadings.)

15. On February 8, 1999, Jeff Johnson was terminated from the employment of Ice Ban America for inappropriate activities by an officer of a public company which included, among other things, the prior described actions. Lynne Johnson's employment ended at approximately the same time.

16. Before the computers were taken from the former offices of Ice Ban (NY), the computer information was wiped clean of all records of these bank accounts and of other suspicious activities of Ice Ban (NY) by Jeff and Lynne Johnson.

17.     Because the computers of Ice Ban (NY) have been erased, the full extent of the activities of Ice Ban (NY) and the full involvement of the Johnson Family in the various frauds and the use of Ice Ban (NY) in such frauds, is not totally known to Ice Ban.

18.     Further, because Jeff Johnson was conspiring with Howard Sears, as explained in detail in the averments in Paragraphs 31 - 36 and 181 188 and others to destroy the companies, many other facts were concealed from Ice Ban America and IBAC.

## IV.     JOHNSONS COMMENCE ILLEGAL SALES OF RESTRICTED ICE BAN AMERICA STOCK.

19.     In August 1996, Ice Ban America, Inc. was formed by its two founders, Janke, and Johnson, Jr. and the Johnson Family.  The Founders planned to create an entity that would have 12,200,000 shares of founders' stock, split approximately equally between Janke and the Johnson Family, and that would issue public stock pursuant to Rule 504(A) of Regulation D.  The founders' stock was issued pursuant to the private placement exemption of the Securities Act of 1933, Section 4(2) 15 U.S.C. §(d)(2) (hereinafter the "Founders Stock.")  Johnson, Jr. and the Johnson family paid $.001 per share, or 1/10 of a cent per share (total $6,400.00) for the founder's stock upon the representation and agreement that the restricted founder's stock would be held for investment purposes only and would not be sold except pursuant to the limitations of Rule 144.  On September 23, 1996, Ice Ban America issued 1,000,000 shares of 10 cent stock pursuant to Rule 504(A) of Regulation D.  In December 1996, Ice Ban America issued 900,000 shares of $1.00 stock pursuant to Rule 504(A) of Regulation D (hereinafter the "Reg D Stock.")  The stock issued pursuant to Rule 504(A) of Regulation D was not subject to the resale restrictions of Rule 502(d) of Regulation D.

20.     Johnson, Jr. and the Johnson Family ultimately directed the issuance of the shares

of Ice Ban America founder's stock so that such stock is currently held by persons or entities

controlled by the Johnson Family or members of the Johnson Family, as follows:

| Names | Shares |
| --- | --- |
| Medical College Fund, Ltd. | 700,000 |
| Windmills Plantation Fund Ltd. | 625,000 |
| Hawk's Nest Plantation Fund, Ltd. | 600,000 |
| Reed International Fund, Ltd. | 750,000 |
| Ryder Securities, Ltd. | 750,000 |
| Marlin Preservation Fund, Ltd. | 500,000 |
| Adam Brown | 150,000 |
| Harvard Fund, Limited | 260,000 |
| Johnson Family Athletic Foundation | 10,000 |
| Dianne Johnson | 200,000 |
| Merchant Trust Fund, Limited | 260,000 |
| Merchants Fund, Ltd. | 100,000 |
| Burton Wickham | 50,000 |

21.     Under the federal and state statutes, rules and regulations, i.e., Johnson Jr. and the

Johnson family under 504 (A) of Regulation D, the stock obtained by a control person of an issuer

pursuant to the 4(2) exemption of the 1933 Securities Act, a private placement, must be

purchased for investment purposes only, i.e., with a present intent to hold said shares for

investment purposes only with no present intent to sell the shares.

22.     A cardinal rule of such exempt transaction is that the stock, of the control person

cannot subsequently be offered or sold by the founders to the general public unless the stock is

registered or meets another exemption.

23.     In complete violation of the federal and state statutes, rules, and regulations, and

with full knowledge of the detrimental effect upon the company and the stock value of the

company, Johnson Jr. and the Johnson Family immediately and secretly undertook various schemes to sell shares of the founders stock they controlled to the public. Such schemes include, but are not limited to, the following, which information has been obtained by Ice Ban America from persons who were the victims of such schemes:

A. In July 1996, even before the company was formed and founder's stock was issued, Johnson, Jr. and Dianne Johnson began soliciting the public sale of founders' stock to Steve Scheer, his family and friends, in Gaylord, Michigan. At the same time, Johnson, Jr. and other members of the Johnson Family began soliciting the sale of founders' stock to Scott Scheer of Palm City, Florida.

B. In the fall of 1996, Johnson, Jr. solicited Steve Scheer and Scott Scheer, both of whom are ministers, to sell founders stock to members of their congregations in Michigan and Florida. Neither Scott nor Steve Scheer are licensed stockbrokers. The shares Johnson, Jr. and the Scheers offered for sale were the founders shares, which could only be sold if they were registered, met an exemption or were sold in accordance with Rule 144 of the Securities Act of 1933. C.F.R. 17, §230.144.

C. Steve Scheer sold 78,000 shares of founders stock to parishioners and friends, and purchased 5,000 shares himself. Steve Scheer mailed a certified check in the amount of $83,000 payable to "Ice Ban" to Jeff Johnson in Lyndonville, NY. This check was endorsed by Jeff Johnson on January 2, 1997 and deposited into the Ice Ban, Inc. (NY) checking account held at M&T Bank, account #82-00196M 021. Steve Scheer in return received 85,000 shares of Ice Ban America founders stock from the Johnson Family, which shares were held by Steve Scheer to be disbursed to the various individuals who purchased from Scheer.

WP023983;1                                    - 10 -

D.     On January 3, 1997, the day after the $83,000 was deposited, Jeff Johnson ordered two certified checks payable to Ice Ban America, Inc.  One check in the amount of $55,000 was used by the Johnson Family to purchase 55,000 of Reg D Stock shares of Ice Ban America in the name of Burton Wickham.  The second check, in the amount of $20,000, was used by the Johnson Family to purchase 20,000 Reg D Stock shares in the name of Steve Rubens.  In each case the Reg D Stock was paid for by fraudulently obtained funds generated by the illegal sale of founders stock to Steve Scheer's friends and parishioners. As indicated previously, at that time the Reg D Stock was freely tradeable, and therefore more desirable to Johnson Jr. and the Johnson family. The founders stock they owned was not freely tradable to the general public by control persons of the issuer. The remaining $8,000 of the net deposit was used by Jeff and Lynne Johnson for their own personal account.

E.     Upon information and belief, the Reg D. Stock purchased by Wickham and Rubens for the Johnson Family were sold and the monies reconveyed to the Johnson Family, or held for the ultimate benefit of the Johnson Family.

F.     On or about December 1, 1996, Johnson, Jr. illegally sold founders shares of Ice Ban America stock to Gerald Cooley.  Johnson, Jr. telephoned Mr. Cooley and led him to believe that he was to receive $1.00 Reg D stock.  As a result of Johnson, Jr.'s representations, Mr. Cooley mailed a certified check in the amount of $45,000 to Johnson, Jr.  Mr. Cooley was instructed by Johnson, Jr. to make the check payable to Ice Ban America, Inc. with the "remitter" being Burton Wickham. Johnson Jr. mailed instructions to the transfer agent stating that 45,000 shares of Reg D stock were to be issued to Burton Wickham in Canada. Johnson, Jr. then

instructed that 45,000 shares of his own restricted founders stock should be re-issued to Mr. Cooley and mailed to him.

G.      Upon information and belief, the Reg D shares purchased by Johnson, Jr. in the name of Burton Wickham were sold and the monies reconveyed, or held for the ultimate benefit of the Johnson Family.

H.      On or about January 13, 1997, Johnson, Jr. telephoned Mr. Cooley again and sold Mr. Cooley an additional 30,000 shares of Ice Ban America founders stock. This time, Johnson, Jr. instructed Mr. Cooley to make a certified check in the amount of $30,000 made payable to M&T Bank and show Cooley as the remitter. Cooley was then instructed to mail the check to Jeff Johnson in Lyndonville, NY. Jeff Johnson took the check to M&T Bank and paid off loans made to Jeff and Lynne Johnson in the amount of $30,000.00. Upon information and belief, the loans to Jeff and Lynne Johnson paid off were loans they had taken to purchase 250,000 shares of 10 cent Reg D Ice Ban America stock.

I.      Cooley received 30,000 shares of founders stock. Jeff and Lynne Johnson transferred the 250,000 shares of 10¢ stock to T. Leonard Fisher, Trustee. He was an alter ego for Johnson Jr. and the rest of the Johnson Family Enterprise. He sold the 250,000 shares of 10¢ stock, and the funds were or are held for the benefit of the Johnson Family, or were reconveyed to the Johnson Family.

J.      In the fall of 1996, Johnson, Jr. sold $30,000 of Ice Ban America founders stock to Walter L. Harber, who was instructed by Johnson, Jr. to deliver and who did deliver a check in the amount of $30,000 to Burton Wickham in return for 39,000 shares of Ice Ban America founders stock. Such check was cashed or deposited by Wickham and Rubens, and the

monies reconveyed to or held for the benefit of the Johnson Family. See Exhibit "4" attached

hereto and incorporated herein.

        K.     On information and belief, shares of Ice Ban America restricted founders

stock were issued at the instructions of the Johnson Family to the following individuals for similar

resale schemes: (a) Arthur and Denise Blessit, 100,000 shares; (b) Dianne Johnson, 100,000

shares; (c) Cheryl Scheer, 30,000 shares; (d) Scott Scheer, 30,000 shares; and (e) William Scheer,

10,000 shares.

        L.     The above illegal and fraudulent sales were accomplished by the Johnson

Family through the use of the U.S. mails and by use of interstate commerce.

## V.  JOHNSONS MISREPRESENT THE VALUE OF ICE BAN (NY) STOCK IN THE SALE TO NATURAL SOLUTIONS CORPORATION

        22.     In July 1997, the shareholders of Ice Ban (NY), which consisted principally of the

Johnson Family, who controlled Ice Ban (NY), negotiated a sale of the stock of Ice Ban (NY) to

Ice Ban America, Inc. now known as Natural Solutions Corporation.

        23.     As a part of such sale, the Johnson Family as control persons and shareholders of

Ice Ban (NY), provided false and fraudulent financial statements of Ice Ban (N.Y.) to Ice Ban

America, which false and fraudulent financial statements included but were not limited to the lack

of disclosure of the Ice Ban (NY) bank accounts in Fort Pierce, Florida and elsewhere used as

part of the above-described scheme to sell founders stock.

        24.     To date, the full financial records of Ice Ban (NY) have been hidden or withheld

from Ice Ban America.  Furthermore, the computer records of Ice Ban (NY) were erased by

Lynne and/or Jeff Johnson in January or February 1999 when Lynne was laid off and Jeff Johnson

was terminated by Ice Ban America. The records were destroyed to cover up their wrong doings and their misrepresentations.

## VI.    <u>JOHNSONS COMMENCE ILLEGAL SALE OF FOUNDERS IBAC STOCK</u>

25.    In 1997, prior to the time when Janke had any knowledge of the above illegal actions, Janke and the Johnson Family were the cofounders of IBAC Corporation, which company was formed for the purpose of licensing and developing de-icing products in Canada, similar to Ice Ban America in the U.S..

26.    Janke and Johnson, Jr. and the Johnson Family each received approximately 50% of 12,200,000 shares of founders' stock in IBAC at the price of $.001 per share, or 1/10 of a cent per share. In September 1997, IBAC issued and sold 500,000 Reg D shares of 20¢ stock, and in December 1997, IBAC issued and sold 900,000 shares of $1.00 Reg D stock.

27.    At this time Johnson Jr. was aware that there was a grand jury investigation into his activities regarding the filing of his bankruptcy. Accordingly, he directed his founders shares be issued as follows:

| <u>Names</u> | <u>Shares</u> |
|---|---|
| Adam Brown | 585,000 |
| Harvard Fund Limited | 570,000 |
| Dianne Johnson | 570,000 |
| Dianne Johnson, Trustee | 900,000 |
| Jeff Johnson | 2,000,000 |
| Paul Johnson | 200,000 |
| Merchants Trust Fund, Ltd. | 570,000 |
| Larry Pratt | 100,000 |
| Sharon Pratt | 100,000 |
| Patricia Wellspeak | 200,000 |
| Michael Ball | 220,000 |

28.     The Johnson Family again proceeded to immediately sell founders stock through a variety of schemes in direct violation of the federal and state statutes, rules, and regulations, and with full knowledge of the detrimental effect upon IBAC, the shareholders of IBAC, and the stock value of IBAC.

29.     The actions of the Johnson Family include, but are not limited to the following, which information has been obtained by IBAC Corporation from persons who acquired stock from members of the Johnson family:

A.     In the fall of 1997, Michael Ball at the request of Johnson, Jr., Dianne Johnson, and the Johnson Family began selling shares of restricted founders stock in IBAC to 122 investors throughout the country.  Such sales were accomplished by telephone calls, and mailings and collection of checks were received by mail.  The monies collected by Michael Ball were deposited into various accounts of the Johnson Family, including Dianne Johnson's account with Paine-Weber Securities.  In return, Michael Ball was issued one certificate of IBAC Corporation stock for 200,000 shares and a second certificate for Ball personally in the amount of 20,000 shares, to compensate Ball for his participation in the above illegal scheme. At various times, Ball sent the purchasers a "Club Letter," Exhibit "5" attached hereto and incorporated herein by reference, with a copy of a certificate issued to him for 200,000 shares purporting to show them their purchase interest. Michael Ball is not and has never been a licenced stockbroker.

B.     Also, in the fall of 1997, Dianne Johnson and the Johnson Family began selling shares of the 900,000 shares issued to Dianne Johnson as trustee.  Eventually, sales were made to 39 individuals.  Some of the 39 individuals resold founders stock to further purchasers in

the same manner as Ball. Such sales were made by use of the telephone and the mails, and monies were collected and deposited into accounts of the Johnson Family and Dianne Johnson.

C. Upon information and belief, the proceeds of the illegal and improper sales of founders stock through Michael Ball, Dianne Johnson, and others were held by the Johnson Family or for the benefit of the Johnson Family.

D. Upon information and belief, founders shares of IBAC stock were issued to the following individuals in similar resale schemes: (a) Christine Ayars, 40,000 shares; (b) Jarred Fenalson, son-in-law of Scott Scheer, 20,000 shares; (c) James Scheer, 10,000 shares; (d) Scott Scheer, 40,000 shares; (e) Steve Scheer, 20,000 shares; (f) William Scheer, 10,000 shares; (g) Douglas Prew, 65,000 shares, and (h) Clinton Yerkes, Dianne Johnson's brother, 25,000 shares. Upon further information and belief the sale of such founders shares and the monies obtained from the sale of such founders shares were for the ultimate benefit of Johnson, Jr. and the Johnson Family.

E. Dianne Johnson and the Johnson Family Trust sold 53,000 shares of IBAC stock to Charles and Karen Chaffee by use of the phone and mails. They resided in Indiana and part of the transaction was there and part in Florida. Further they sold 25,000 shares to Charles Chaffee in Florida. All of these sales were of founders stock which the Johnsons could not sell unless the stock was registered or sold pursuant a registration exemption or the requirements of Rule 144 of the Securities Act of 1933. See exhibit "6 " attached hereto and incorporated herein.

F. All of the above illegal and fraudulent sales were accomplished by the Johnson Family and their associates through the use of the U.S. Mail and by use of interstate commerce.

## VII.   JOHNSONS ATTEMPT TO COVER UP THEIR SCHEMES

30.     The Johnson Family has taken numerous actions to cover up and hide their fraudulent schemes from Counter-Plaintiffs.  These attempts to cover-up include but are not limited to the following:

A.      The Johnsons' Family's attorney, Nathan Lyman, who was also a holder of Ice Ban (NY) stock in the sale to Ice Ban America, and a buyer and seller of Ice Ban America stock, has refused to produce files relating to his representation of Ice Ban (NY), from 1994 to 1997, even though Ice Ban America is now the client, as owner of Ice Ban (NY).  On information and belief, such refusal to produce the files on Lyman's representation of Ice Ban (NY) is at the insistence and direction of Ice Ban (NY)'s former controlling shareholders, the Johnson Family.

B.      No records remain in Ice Ban (NY) of the Ice Ban (NY) bank accounts at Riverside Bank in Fort Pierce, Florida, or elsewhere, which bank accounts were used for the illegal and improper purposes described above.  Such bank records have been destroyed or hidden by the Johnson Family to prevent further investigation.

C.      During the criminal bankruptcy fraud investigation of Johnson, Jr. by the FBI, Ice Ban America participated fully with the FBI and the Department of Justice to determine whether any of Ice Ban America's and IBAC's officers or employees were engaged in any criminal activity.  Jeff and Lynne Johnson, who were employees of Ice Ban America at the time, refused to cooperate with the FBI, refused to give statements to the FBI, and refused to turn over any documents or papers of Ice Ban America, or of its now subsidiary, Ice Ban (NY), to the FBI or the Department of Justice.  The effect and purpose of such conduct was to hide not only the criminal conduct of Johnson, Jr. but also the overall fraudulent conduct of the Johnson Family in

WP023983;1                                    - 17 -

regards to the stock sales described above.  Substantially all of the illegal and fraudulent  conduct of the Johnson Family described in this Counterclaim was uncovered by the FBI and the Justice Department after Johnson Jr's conviction for bankruptcy fraud in November of 1998 and prior to sentencing in June 1999.

        D.      Dianne Johnson avoided deposition for three months. When she finally appeared, she availed herself of her fifth amendment rights which prevented the Defendants from learning  the true facts of her involvement and other pertinent information in the case being brought against them. She did testify in her deposition that she did not know of any criminal investigation of her taking place at this time.

        E.      The Johnson Family have placed assets in corporations set up in the Turks and Caicos Islands and in Nevis to prevent creditors from recovering and locating assets and the proceeds of sales of assets.  Upon information and belief, proceeds of such sales are held by the Johnson Family and their associates in bank accounts in various offshore locations.

        F.      On or about March 20, 1998, Dianne Johnson picked up from the offices of Ice Ban America, stock certificates of  Ice Ban America issued in the name of certain corporate entities at the instruction of Johnson, Jr.  Such stock certificates were to be delivered to Reg Bodhanya, the named trustee for the corporate entities, but such corporate certificates have disappeared. Dianne Johnson did testify that she remembered picking up the package, denied any knowledge as to the contents and has no idea what she did with it.

## VIII.   THE JOHNSONS DECIDE TO DUMP THEIR STOCK AND CONSPIRE TO STEAL THE ICE BAN BUSINESS

     31.     After they received founders stock, the Johnson Family, in violation of the state and federal securities statutes, and the  rules and regulations promulgated thereunder, attempted

to have the restrictions lifted on the stock in order to sell the stock, and attempted to sell amounts of stock far in excess of the amounts permitted by SEC rules and regulations. These sales were to be made to persons who did not meet the requirements of qualified buyers of stock.

32.     In late 1998, the Johnson Family decided that further efforts to squeeze funds and monies out of further illegal and improper sales of Ice Ban America and IBAC stock would be unsuccessful. With the FBI investigation of Johnson, Jr., the criminal bankruptcy trial of Johnson, Jr. and the attendant publicity, the Johnson Family feared that their various schemes would shortly be discovered.

33.     Commencing in late 1998, the Johnson Family accelerated their efforts to have the restrictions lifted and to sell their founders' stock. In essence, the Johnson Family commenced a concerted effort to destroy the remaining value and business of the Ice Ban companies by "dumping" their shares.

34.     In addition to dumping their own founders stock, the Johnson Family began to encourage owners of Reg D shares to dump their holdings to further depress the market for Ice Ban America and IBAC stock. The actions of the Johnson Family included but was not limited to: (1) Jeff Johnson advising owners of IBAC and Ice Ban America Reg D stock to sell their shares and buy shares of a new Johnson Family company, Globalnet, which company was also substantially owned or controlled by the Johnson Family; (2) Jeff Johnson and the Johnson Family disclosed confidential corporate insider information to the investing public and to potential competitors; (3) Jeff Johnson and the Johnson Family began disparaging Ice Ban America, IBAC, and George Janke in communications to stockholders, suppliers, distributors, and purchasers, and in various Internet chat rooms.

35.     In late 1998, Jeff Johnson, while still vice-president, Chief Operating Officer and a director of Ice Ban America and IBAC, began a series of meetings with Greg Baun of IMUS, Inc. (collectively "IMUS") and Howard Sears of Sears Petroleum and Transport, Inc. and Sears Oil Company, Inc. (collectively "Sears"), for the purpose of conspiring to destroy the value of the Ice Ban business for the purpose of ultimately obtaining the patents and patent licenses and trademarks of Ice Ban and, thereby, to obtain the business of Ice Ban.  As a part of this conspiracy, the Johnson Family, Sears, and IMUS took the following affirmative acts, among others, in furtherance of their illegal and improper actions:

A.     Sears and IMUS, with Jeff Johnson's active participation, refused to enter into a distribution agreement with Ice Ban America for the New England States which had been negotiated over a period of one year;

B.     IMUS refused to enter into a distribution agreement for New York State, which had also been negotiated;

C.     IMUS, with the active cooperation of Jeff Johnson, ordered and was shipped over $250,000 of Ice Ban Product with no intention of paying for such product;

D.     Sears, with inside information and the assistance of Jeff Johnson, attempted to purchase certain patent rights, which Sears knew had been  previously purchased years earlier by Janke for the benefit of Counter-Plaintiffs and in breach of a confidentiality agreement Sears had signed with Ice Ban America; See Exhibit "7" attached hereto and incorporated herein.

E.     IMUS, Sears, and Johnson conspired with other distributors of Ice Ban America to set up a competitive business with Ice Ban America's and to ultimately put Ice Ban America out business.

WP023983;1                                    - 20 -

F.      Under the ruse of continuing to do business with Ice Ban America, IMUS and Sears, with the active assistance of Jeff Johnson, attempted to set up a competitive business with Ice Ban America, using Ice Ban's patents, suppliers, and customers.

G.      Jeff Johnson, IMUS and Sears contacted Ice Ban America's and IBAC's suppliers and distributors and defamed Ice Ban America, IBAC, and George Janke to interfere with and cause the breach of such business relationships and contracts with Ice Ban America and IBAC.

36.      The actions of Sears, IMUS, and the Johnson Family have been to obtain the business, suppliers, and customers of Ice Ban for their own benefit, in a manner which will permit the Johnson Family to again sell stock to the public.

## IX.    DAMAGES TO ICE BAN AMERICA, INC., IBAC, AND THEIR SHAREHOLDERS

37.      The actions of Johnson, Jr. and the Johnson Family have caused significant damages to Ice Ban America, Inc., IBAC Corp. and their shareholders in numerous ways, including but not limited to:

A.      Loss of business reputation;

B.      Loss of profits and increased losses;

C.      Loss of potential purchasers for public shares;

D.      Loss of value of the business and stock of the business;

E.      Loss of customers for IceBan® products;

F.      Loss of financing opportunities, and opportunities for public offerings of stock;

G.      Increased expenses of operations;

WP023983;1                          - 21 -

H.      Increased costs and attorneys fees; and

I.      Increased investigative and administrative costs.

38.     The damages caused by Johnson, Jr. and the Johnson Family are irreparable, and incapable of calculation and recovery in an action at law. Counter-Plaintiffs seek rescission and cancellation of the Ice Ban America, Inc. and IBAC founders shares issued to Johnson, Jr., the Johnson Family, and entities and persons holding such shares on behalf of the Johnson Family, with the exception of the stock issued by Ice Ban America for the acquisition of Ice Ban, Inc. (N.Y.) on which claims Ice Ban America, Inc. seeks damages.

39.     The actions of Johnson, Jr. and the Johnson Family have also damaged numerous individuals who purchased founders shares from the Johnson Family and their associates. These individual investors were without knowledge that such sales were in violation of securities laws of the United States and Florida. Further, the acquisition of such shares by the Johnson Family was an intentional fraud of Ice Ban America and IBAC. The full extent, number, and losses of the individuals remain unknown to Counter-Plaintiffs. The damages will increase if the Johnson Family is permitted to retain their founders stock and continue to engage in their fraudulent schemes to dispose of said stock.

40.     Such individuals, having previously been damaged by the described criminal activities and schemes should not be further damaged by a rescission of their founders stock in this action. Although itself a victim of the fraudulent schemes of Johnson Jr., the Johnson family and other named culpable parties, the Counter-Plaintiff is cognizant of its duty to "do equity." Counter-Plaintiffs hereby offer to establish a Victims Recovery Fund for such bona fide purchasers without notice from the Johnson Family to consist of up to 30% of all founders shares

obtained or canceled by this action, which Fund shall be disbursed on a pro rata basis to such

purchasers, not to exceed the number of founders shares purchased for future delivery from the

Johnson Family.  In that manner, such bona fide purchasers will actually receive what had been

sold to them, i.e., restricted shares in Counter-Plaintiffs.  Upon the conclusion of this action and

distribution of the Fund, if all applicable time periods have run, the restrictions on such shares will

be removed to the extent permitted by applicable law, rules, and regulations.


**X**      **GENERAL AVERMENTS AS TO IBAC RESCISSION**

41.      The securities in questions and the consideration paid for same are as alleged by

the Johnsons in paragraphs 18-23 of the Johnsons original Complaint, which IBAC has admitted

as true.

42.      Based on the fact that the Johnsons allege dissatisfaction with their equity position

IBAC has tendered an offer of rescission pursuant to Florida Statute §517.211 Exhibit "8"

attached hereto and incorporated herein by reference, and IBAC stands ready, willing and able to

rescind.  Further IBAC stands ready, willing and able to pay the full amount paid by the Johnsons

for their stock plus interest at the statutory rate since the time of their purchase.

43.      Based upon the allegation set forth here, the Johnsons have already received

profits in excess of what they paid for the stock and the interest which shall have accrued.

**XI**     **GENERAL AVERMENTS AS TO ICE BAN AMERICA RESCISSION**

44.      The securities in questions and the consideration paid for same are

| Names | Shares | Cost |
|---|---|---|
| Medical College Fund, Ltd. | 700,000 | $700.00 |
| Windmills Plantation Fund Ltd. | 625,000 | $625.00 |

| | | |
|---|---|---|
| Hawk's Nest Plantation Fund, Ltd. | 600,000 | $600.00 |
| Reed International Fund, Ltd. | 750,000 | $750.00 |
| Ryder Securities, Ltd. | 750,000 | $750.00 |
| Marlin Preservation Fund, Ltd. | 500,000 | $500.00 |
| Adam Brown | 150,000 | $150.00 |
| Harvard Fund, Limited | 260,000 | $260.00 |
| Johnson Family Athletic Foundation | 10,000 | $ 10.00 |
| Dianne Johnson | 200,000 | $200.00 |
| Merchant Trust Fund, Limited | 260,000 | $260.00 |
| Merchants Fund, Ltd. | 100,000 | $100.00 |
| Burton Wickham | 50,000 | $ 50.00 |

45.     These parties all received their stock as part of the Johnson Family which intended to begin selling immediately, if they had not done so prior to the receipt of the stock. Based on the fact that the Johnsons allege dissatisfaction with their equity position in Ice Ban America, Ice Ban America has tendered an offer of rescission pursuant to Florida Statute §517.211, Exhibit "9" attached hereto and incorporated hereing by reference, and Ice Ban America stands ready, willing and able to rescind.  Further Ice Ban America stands ready, willing and able to pay the full amount paid by the Johnsons for their stock plus interest at the statutory rate since the time of their purchase.

46.     Based upon the allegation set forth here, the Johnsons have already received profits in excess of what they paid for the stock and the interest which shall have accrued.

## COUNT 1

## RESOLUTION UNDER F.S.A. §517.211 BY IBAC - RESCISSION

47.     Paragraph 1 - 46 are re-alleged and incorporated herein.

48.     The statutory remedy provided in Florida Statute §517.211 is tantamount to a resolution of all claims relevant to IBAC.  In the interest of judicial economy, the "resolution" provisions ought to be enforced and all other claims against IBAC asserted by the Johnsons dismissed as the remedy provided by F.S.A. §517.211 is an exclusive remedy.

49.     IBAC has had to hire the undersigned attorneys to defend this lawsuit. Since the tender made is past the statutory 30 days without acceptance and the Johnsons persist in prosecuting this matter, IBAC demands attorney fees and costs pursuant to F.S.A. §517.211 (6).

WHEREFORE, IBAC seeks rescission of all founders' shares held by any member of the Johnson Family, or any controlled entity, as specified in Paragraph 27 and costs and attorneys fees and all other remedies that this court deems fair and just.

## COUNT 2

### RESOLUTION  UNDER F.S.A. §517.211 BY ICE BAN AMERICA

50.     Paragraph 1 - 46 are re-alleged and incorporated herein

51.     The statutory remedy provided in Florida Statute §517.211 is tantamount to a resolution of all claims relevant to Ice Ban America.  In the interest of judicial economy, the "resolution" provisions ought to be enforced and all other claims against Ice Ban America asserted by the Johnsons dismissed as the remedy provided by F.S.A. §517.211 is an exclusive remedy.

52.     Ice Ban America has had to hire the undersigned attorney to defend this lawsuit. If the tender goes past the statutory 30 days without acceptance and the Johnsons persist in prosecuting this matter, Ice Ban America demands attorney fees and costs pursuant to F.S.A. §517.211 (6).

WHEREFORE, Ice Ban America seeks rescission of all founders' shares held by any member of The Johnson Family, or any controlled entity as specified in Paragraphs 20 and 44 and costs and attorneys fees and all other remedies that this court deems fair and just.

WP023983;1                                    - 25 -

## COUNT 3

## FRAUDULENT TRANSACTIONS; FALSIFICATION OR CONCEALMENT

## OF FACTS; FLORIDA STATUTE § 517.301 - RESCISSION

53.     IBAC re-alleges paragraphs 1 through 46 as if they were restated and re-alleged fully

herein.

54.     The Johnsons allege in their complaint that they were told by IBAC that the founders

stock would become "immediately free trading" after the expiration of the appropriate holding period

of time (See paragraph 26 of the original Complaint.)

55.     The securities in question were never registered and there was never any promise,

intent or obligation by IBAC to register same. In fact, the shares were issued with a restrictive legend

indicating the true nature of the shares. The sales in questions were made based on the specific

representation that the Johnsons, all relatives of Warren Johnson, Jr., were purchasing for their own

account with no intent towards redistribution and IBAC relied on said representations to its detriment

in issuing the stock.

56.     The Johnsons, insiders and control persons by definition, intended to be re-issuers at

the time subject securities were purchased.  That intent violated Florida Blue Sky law, since these

securities were not registered and constituted a fraudulent concealment in violation of F.S.A. §

517.301.


WHEREFORE, IBAC seeks rescission of all founders' stock specified in Paragraph 27 under

F.S.A. § 517.211 (2) and (3)(b) and costs and attorney fees under F.S.A. §517.211 (6).

## COUNT 4

### MUTUAL MISTAKE - RESCISSION

57.     IBAC re-alleges paragraphs 1 through 46 as if they were restated and re-alleged fully herein.

58.     In their complaint, the Johnsons allege that they were told by IBAC that the founders stock would become "immediately free trading" after the expiration of the appropriate holding period of time (See paragraph 26 of the original Complaint).

59.     If this is what Johnsons think they were told, then there was a mutual mistake of material fact, since the Johnsons were insiders subject to the aggregation rules, Rule 144 and the securities laws of the United States and the State of Florida and were, at all times, required to alienate their shares pursuant to an exemption from State and Federal securities laws; and were required to provide IBAC with a satisfactory opinion of qualified counsel to the effect that any such sale was an exempt transaction and not in violation of applicable State and Federal securities laws.

60.     If Johnsons' understanding was as they allege, then there was a mutual mistake of a material fact and rescission is in order.

WHEREFORE, IBAC seeks rescission of all founders' stock as specified in Paragraph 27 and does hereby tender the purchase price with interest at the legal rate from the date of purchase.

## COUNT 5

## FRAUDULENT TRANSACTIONS: FALSIFICATION OR CONCEALMENT OF FACTS: FLORIDA STATUTE § 517.301 - RESCISSION

WP023983;1

61.     ICE BAN AMERICA re-alleges paragraphs 1 through 46 as if they were restated and re-alleged fully herein.

62.     The Johnsons allege in their complaint that they were told by ICE BAN AMERICA that the founders stock would become "immediately free trading" after the expiration of the appropriate holding period of time (See paragraph 25 of the original Complaint.)

63.     The securities in question were never registered and there was never any promise, intent or obligation by ICE BAN AMERICA to register same. In fact, the shares were issued with a restrictive legend indicating the true nature of the shares. The sales in questions were made based on the specific representation that the Johnsons, all relatives of Warren Johnson, Jr., were purchasing for their own account with no intent towards redistribution and ICE BAN AMERICA relied on said representations to its detriment in issuing the stock.

64.     The Johnsons, insiders and control persons by definition, intended to be re-issuers at the time subject securities were purchased.  That intent violated Florida Blue Sky law, since these securities were not registered and constituted a fraudulent concealment in violation of F.S.A. § 517.301.

WHEREFORE, ICE BAN AMERICA seeks rescission of all founders' stock specified in Paragraphs 20 and 44 under F.S.A. § 517.211 (2) and (3)(b) and costs and attorney fees under F.S.A. §517.211 (6).

## COUNT 6

### MUTUAL MISTAKE - RESCISSION

65.     ICE BAN AMERICA re-alleges paragraphs 1 through 46 as if they were restated and re-alleged fully herein.

66.     In their complaint, the Johnsons allege that they were told by ICE BAN AMERICA that the founders stock would become "immediately free trading" after the expiration of the appropriate holding period of time (See paragraph 25 of the original Complaint).

67.     If this is what Johnsons think they were told, then there was a mutual mistake of material fact, since the Johnsons were insiders subject to the aggregation rules, Rule 144 and the securities laws of the United States and the State of Florida and were, at all times, required to alienate their shares pursuant to an exemption from State and Federal securities laws; and were required to provide ICE BAN AMERICA with a satisfactory opinion of qualified counsel to the effect that any such sale was an exempt transaction and not in violation of applicable State and Federal securities laws.

68.     If Johnsons' understanding was as they allege, then there was a mutual mistake of a material fact and rescission is in order.

WHEREFORE, ICE BAN AMERICA seeks rescission of all founders' stock as specified in Paragraphs 20 and 27 and does hereby tender the purchase price with interest at the legal rate from the date of purchase.


## COUNT 7

### CONVERSION JEFF JOHNSON AND LYNNE JOHNSON - DAMAGES

69.     Ice Ban America realleges paragraphs 1 - 46 as if they are restated and re-alleged herein.

70.     As part of the Cooley Transaction described in Paragraphs 23F-23J above, Jeff and Lynne Johnson received a $30,000.00 check which belonged to Ice Ban America and misappropriated those funds to pay off their personal loans and bills.

71.     Jeff and Lynne Johnson knew that they had no right to keep the funds.

72.     Jeff and Lynne Johnson converted the funds of Ice Ban America by their exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner.

73.     Jeff and Lynn Johnson have caused damage to Ice Ban America of at least $30,000.00 and have profited by their conversion in a sum in excess of such amount.

74.     Jeff and Lynn Johnson's acts have been a deliberate invasion of Ice Ban America's Property and justifies punitive damages.

Wherefore, Ice Ban America prays for damages from Jeff and Lynne Johnson, jointly and severally of $30,000.00, punitive damages, plus interest and costs and all other relief that this court deems fair and just.

## COUNT 8

### CIVIL THEFT  JEFF AND LYNNE JOHNSON - DAMAGES

75.     Ice Ban America realleges paragraphs 1 - 46 as if they are restated and re-alleged herein.

76.     Jeff and Lynne Johnson kept the $30,000 of Ice Ban America's funds which they knew were for the purchase of Ice Ban America stock.

77.     Jeff and Lynne Johnson used the funds for their own purpose.

78.     Jeff and Lynne Johnson did knowingly, willfully and wantonly steal the funds which belonged to Ice Ban America.

WP023983;1                                     - 30 -

79.     These acts were part of a sophisticated scheme, plot and/or device to steal the funds.

80.     Jeff and Lynne Johnson did conceal their actions from Ice Ban America.

81.     Ice Ban America has damages of at least $30,000.00

82.     In accordance with § 772.11, Fla. Stat. (1995) Ice Ban America should be awarded treble damages.

83.     An award of treble damages is appropriate though there was a contractual relationship between the parties where evidence established intricate, sophisticated scheme of deceit and theft and supported finding of civil theft, not simple breach of contract.

WHEREFORE, ICE BAN AMERICA prays for $30,000, plus $90,000.00 treble damages from Jeff and Lynne Johnson, jointly and severally, plus interest and costs and all other relief that this court deems fair and just.

**COUNT 9**

**BREACH OF A FIDUCIARY DUTY BY JEFF AND LYNNE JOHNSON - DAMAGES**

84.     All allegations in paragraphs 1 - 46 are re-alleged herein.

85.     That Jeff and Lynne Johnson were both insiders of Ice Ban America, as officers, employees, and a director.

86.     That Jeff and Lynne Johnson both knew that they were not allowed to take funds from third parties and keep such funds, that were intended for Ice Ban America..

87.     Jeff and Lynne Johnson both knew that neither they nor Johnson Jr. could transfer or promise to transfer their founder's stock unless offered or sold in accordance with Rule 144 of the Securities Act of 1933. In spite of this fact, Jeff and Lynne Johnson facilitated the transfer of

Johnson's founders stock to Cooley and used the funds Cooley had sent to purchase Reg D stock and to pay their personal debts.

88.     That Jeff and Lynne Johnson both knew that neither they nor Johnson Jr. could transfer or promise to transfer their restricted stock in violation of Rule 10b-5 of the Securities regulations of 1934 while using the purchasers funds to pay their own bills.

89.     With full knowledge of the impropriety of their actions Jeff and Lynne Johnson did make a secret profit to the detriment of Ice Ban America.

90.     Ice Ban America has been damaged and Jeff and Lynne Johnson have profited from these actions and made a secret profit in using such funds derived from the $30,000 check to purchase 10 cent Ice Ban stock, which was then resold for Johnsons' benefit.  An officer or director of corporation is precluded from making any secret profit or deriving any personal advantage at expense of corporation, absence showing he acted with consent of shareholders, and any such secret profit must be disgorged.  West's F.S.A. § 607.111(4)

WHEREFORE ICE BAN AMERICA prays for damages from Jeff and Lynne Johnson, jointly and severally, of $30,000.00, plus all profits which Jeff and Lynne Johnson made from their actions plus interest,  costs and attorneys fees and all other relief that this court deems fair and just.

## COUNT 10

### EMBEZZLEMENT AS TO JEFF JOHNSON AND LYNNE JOHNSON - DAMAGES

91.     Ice Ban America re-alleges and incorporates paragraphs 1 - 46.

92.     Jeff and Lynne Johnson knew that the $30,000 of funds received from Cooley belonged to Ice Ban America and did not belong to them.

93.     That Jeff and Lynne Johnson knew that they had no right to deposit the funds into the Ice Ban Inc. (NY) account, which they controlled.

94.     Jeff and Lynne Johnson knew that they did not have the right to pay their personal bills with these funds

95.     Jeff and Lynne Johnson did pay their personal bills with the funds of Ice Ban America.

96.     As insiders and officers and they were aware that they were taking these funds from Ice Ban America and that their actions were done willfully, wantonly and with malice aforethought.

Wherefore, Ice Ban America prays for damages from Jeff and Lynne Johnson, jointly and severally, of $30,000.00 plus costs interest attorney's fees and punitive damages and all other relief that this court deems fair and just .

## COUNT 11

## CONSPIRACY AS TO JEFF JOHNSON AND LYNNE JOHNSON - DAMAGES

97.     Plaintiff reallages and incorporates paragraphs 1 - 46.

98.     Jeff and Lynne Johnson conspired with each other and with Johnson Jr. to obtain funds from Cooley which were to go to Ice Ban America.

99.     Such action was done with the knowledge of Johnson Jr., Jeff and Lynne Johnson for the purpose of financial benefit for themselves and to the detriment of Ice Ban America.

100.    Such actions damaged Ice Ban America.

101.    Such actions were willful, wanton and with malice aforethought.

WHEREFORE, ICE BAN AMERICA prays for damages from Jeff and Lynne Johnson, jointly and severally, of $30,000.00, plus punitive damages, costs, attorneys fees, interest and all other relief that this court deems fair and just.

## COUNT 12

### FRAUD AS TO JEFF JOHNSON AND LYNNE JOHNSON

102.     Ice Ban America reallages and incorporates paragraphs 1 - 46.

103.     The actions taken by Jeff and Lynne Johnson in handling the $30,000 check of Cooley were taken to obtain and misappropriate funds which were to go to Ice Ban America.

104.     Jeff and Lynne Johnson knew they did not have a right to the funds.

105.     Jeff and Lynne Johnson knew that Ice Ban America relied Johnson Jr. as an insider, officer, director and control person and that they were working and conspiring with him and were using his insider information and authority, both actual and apparent.

106.     Jeff and Lynne Johnson knew that Cooley believed that the funds were going to Ice Ban America for the purchase of Reg D Stock.

107.     Jeff and Lynne Johnson knew that Johnson Jr. was not reselling his founders stock in accordance with Rule 144 of the Securities Act of 1933, or Rule 10b-5 of the Securities Act of 1934, and they knew that Ice Ban America had a right to rely upon Johnson Jr. not to violate the rule.

108.     Johnson, Jr. did violate the rule and transact illegal stock transactions to Jeff and Lynne Johnsons benefit and to the detriment of Ice Ban America.

109.     Jeff and Lynne Johnson were an integral part of Johnson Jr's scheme to illegally sell his founders stock and participated in the improper transfer of founders shares.

110.    Such fraud is sufficient to support an award for punitive damages by the conduct of Jeff and Lynne Johnson.

111.    Ice Ban America has been damaged by the conduct of Jeff and Lynne Johnson.

Wherefore, Ice Ban America prays for damages from Jeff and Lynne Johnson, jointly and severally, of $30,000.00 plus punitive damages, costs and attorneys fees and all other relief that this court deems fair and just.

## COUNT 13

## INVESTMENT CLUBS - SECURITIES FRAUD - JOHNSON FAMILY

112.    Ice Ban America and IBAC reallege and incorporate Paragraphs 1 - 46.

113.    Commencing in July, 1996, The Johnson Family began forming various "Investment Clubs" for the purpose of carrying out a sophisticated stock fraud scheme.

114.    Such clubs operated by interested parties being contacted by one of the Johnson Family, or their affiliates and told that this was a good "Christian" investment.  Stock was sold through churches, and stock was given as a commission for selling more stock.  The stock that was "sold" was founders stock, but this fact was withheld from many purchasers who thought they were buying tradeable Reg D stock.  Purchasers would pay immediately and be promised that they would receive their certificates in the future.  Some investors actually received their stock because Johnson Jr., while president of Ice Ban America, instructed the transfer agent to issue the shares and represented to Atlas that the stock could be issued.

115.    More than one investment club, (Ball Clubs), operated around the Country.  The Ball Clubs, which are known to Ice Ban America and IBAC, were run by Michael Ball, Steve Scheer, and Dianne Johnson. Based upon recent conversations it is believed that Douglas Prew,

**MEDICAL COLLEGE FUND, LTD., WINDMILLS PLANTATION FUND LTD.,**

**HAWK'S NEST PLANTATION FUND, LTD. , REED INTERNATIONAL FUND, LTD.,**

**RYDER SECURITIES, LTD., MARLIN PRESERVATION FUND, LTD., HARVARD**

**FUND, LIMITED, JOHNSON FAMILY ATHLETIC FOUNDATION, MERCHANT**

**TRUST FUND, LIMITED, MERCHANTS FUND, LTD., AND SONEET KAPILA AS**

**THE TRUSTEE IN BANKRUPTCY, FOR WARREN JOHNSON**

134.   Ice Ban America and IBAC reincorporate paragraphs 1 - 46.

135.   That prior to the formation of Ice Ban America and IBAC the above-named parties were conspiring to trade founder's shares of Ice Ban America in violation of the Securities and Exchange Acts of 1933 and 1933 and the Rules promulgated thereunder.

136.   That the shares of stock issued  to such parties were taken by them as alter egos of Johnson, Jr. for the multiple purposes of:

      A.    Defrauding creditors of Johnson Jr.

      B.    Hiding funds from the FBI and the Justice Department, which organization were investigating Johnson Jr. and he was aware of the investigation.

      C.    Allowing the Johnson Family to violate the Securities Exchange Acts of 1933 and 1933 and the Rules promulgated thereunder without being detected by Ice Ban America, IBAC and the SEC.

137.   That these parties sold founders shares of Ice Ban America with impunity.

138.   That these parties hid assets from Johnson Jr's. creditors.

139.   That many of the parties were already found to be alter egos of Johnson Jr in the criminal proceeding.

140.    That Burton Wickham has acted as an alter ego of Johnson Jr. by syphoning and hiding funds of the illegally traded stock.

141.    The Johnson Family has created multiple offshore corporations and trusts to funnel and launder their illegally raised funds.

142.    The Johnson Family has funneled funds to T. Leonard Fisher to deposit into offshore accounts to prevent and delay tracing such funds.

143.    All of these actions were taken as a concerted effort to effect an illegal stock scheme and defraud Ice Ban America and IBAC out of it's legitimate stock purchasers and defraud the stockholders of Ice Ban America and IBAC by controlling the market illegally.

144.    All such actions were taken willfully, wantonly and with malice aforethought.

145.    All such parties were insiders and/or controlled by Johnson Jr.

146.    Ice Ban America and IBAC had a right to rely on the actions of these parties as fiduciaries and alter egos of Johnson Jr.

147.    Ice Ban America and IBAC did rely on the fact that these parties were acting honestly and in the best interests of Ice Ban America and IBAC.

148.    That these parties relied upon the fact that Ice Ban America and IBAC would trust their actions.

149.    That Ice Ban America and IBAC have been damaged by the of the parties

150.    That the actions caused damages in excess of $22,000,000.00 by their actions.

151.    Soneet Kapila, as Trustee for Warren Johnson Jr., has taken possession of considerable assets of Johnson Jr., including most of the Johnson Family founders stock and Reg D stock and some profits made from the sales which Judge Ryskamp found belonged to Johnson Jr.

On information and belief, T. Leonard Fisher and Burton Wickham control substantial assets of the Johnson Family which the trustee has not yet taken in it's possession.

Wherefore Ice Ban America and IBAC prays for damages of $22,000,000.00 plus costs, interest, and punitive damages jointly and severally,  against the parties listed above and against Soneet Kapila as Trustee as to the assets he controls and all other relief that this court deems fair and just.

### Count 17

### VIOLATIONS OF FSA 517.301, FRAUDULENT TRANSACTIONS

**As to Dianne Johnson, Individually and as Trustee for the Johnson Family Trust, Jeffrey Johnson, Lynne Johnson, Paul Johnson, Adam Brown, Kelly Brown, Patricia Wellspeak, Sharon Pratt, Lawrence Pratt And Warren Johnson, Sr., Burton Wickham, T. Leonard Fisher, Mark Johnson, individually and as Trustee for: Medical College Fund, Ltd., Windmills Plantation Fund Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund, Limited, Johnson Family Athletic Foundation, Merchant Trust Fund, Limited, Merchants Fund, Ltd., and SONEET KAPILA as the Trustee in Bankruptcy, for Warren Johnson**

152.     ICE BAN AMERICA, INC. and IBAC reincorporate paragraphs 1 - 46.

153.     That these parties were all sellers or purchasers of stock in violation of F.S.A. 517.301.

154.     That they all knew that they were engaging in a transaction for the purpose of defrauding creditors of Johnson Jr.

155. All of the parties that participated in Ball Clubs knew that they were employing a devise, scheme or artifice to defraud.

156. That the parties to the offshore trusts knew that the stocks and funds were being placed there to defraud.

157. That T. Leonard Fisher and Burton Wickham both knew that they were helping to hide the funds derived from the illegal sales of founders and Reg D stock.

158. That Soneet Kapila, as Trustee hold, or controls certain stock of The Johnson Family.

159. That Soneet Kapila, As Trustee controls the other known assets of the Johnson Family Enterprise.

160. Ice Ban America should be awarded damages and any profits received from any sales of founder's stock and rescission of the sale of any founders stock remaining in the names of any of the parties named in this count. O'Donnell v. Arcoiries, Inc. 561 So2d 344, (Fla App. 4 Dist. 1990) F.S.A. 517.301 Fraudulent Transactions; Falsification or Concealment of Facts. F.S.A. 517.211, Remedies Available in Case if Unlawful Sale. Ice Ban America should be awarded damages and Rescission.

WHEREFORE ICE BAN AMERICA and IBAC pray for Rescission of all founders and Reg D stock in accordance with F.S.A. 517.211, plus all other relief granted under this statute including damages for shares which have been sold to bonafide purchasers and for any profits derived therefrom. Further, Ice Ban America and IBAC hereby tender the consideration paid for the shares plus the legal interest rate less the amount of income that the Counter defendant has received, which is in excess of the consideration paid, plus attorneys fees and all other relief that this court deems fair and just.

## COUNT 18

## RICO

**AS TO DIANNE JOHNSON, INDIVIDUALLY AND AS TRUSTEE FOR THE JOHNSON FAMILY TRUST, JEFFREY JOHNSON, LYNNE JOHNSON, PAUL JOHNSON, ADAM BROWN, KELLY BROWN, PATRICIA WELLSPEAK, SHARON PRATT, LAWRENCE PRATT AND WARREN JOHNSON, SR., BURTON WICKHAM, T. LEONARD FISHER, MARK JOHNSON, INDIVIDUALLY AND AS TRUSTEE FOR: MEDICAL COLLEGE FUND, LTD., WINDMILLS PLANTATION FUND LTD., HAWK'S NEST PLANTATION FUND, LTD., REED INTERNATIONAL FUND, LTD., RYDER SECURITIES, LTD., MARLIN PRESERVATION FUND, LTD., HARVARD FUND, LIMITED, JOHNSON FAMILY ATHLETIC FOUNDATION, MERCHANT TRUST FUND, LIMITED, MERCHANTS FUND, LTD., AND SONEET KAPILA AS THE TRUSTEE IN BANKRUPTCY, FOR WARREN JOHNSON**

161.    Ice Ban America, Inc. and IBAC reincorporate paragraphs 1 - 46.

162.    The above parties to this count, did, within the definition of F.S.A. 772.102, conspire to commit and committed violations of the law which is chargeable by indictment or information under the following provision, Chapter 517, relating to securities.

163.    That these parties, worked together to run this "Enterprise."

164.    That there was a pattern of criminal activity with hundreds of transactions in at least eight separate states of the U.S. (Florida, Georgia, Kentucky, New York, Illinois, Michigan, Missouri and California) and four foreign countries, Canada, Nevis, Turks and Caicos and Ireland.

165.    There are fourteen separate trusts or corporations, many of them being offshore which are controlled by Johnson Jr. or the Johnson Family.

166.    There are at least 12 Johnson family members and five different preachers or church members directly involved and hundreds indirectly involved in the overall scheme devised by Johnson Jr. and the Johnson Family.

167.    That these parties, did, with criminal intent, receive proceeds derived, directly and/or indirectly from a pattern of criminal activity.

168.    That the proceeds are, upon information and belief, in excess of $3,000,000.00.

169.    That F.S.A. 772.104 mandates an award of threefold actual damages, reasonable attorney's fees and court costs

170.    That these actions were committed multiple times as part of a continuing criminal enterprise.

WHEREFORE, Ice Ban America and IBAC pray for damages in excess of $9,000,000.00 plus reasonable attorney's fees and costs and all other relief that this court deems fair and just.


## COUNT 19

## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIPS
## BY JEFF JOHNSON

171.    Ice Ban America, Inc. and IBAC reallege Paragraphs 1 - 46.

172.    That Jeff Johnson, tortiously interfered with existing Ice Ban America and IBAC distributors and customers, specifically IMUS, Innovative, Sears and the Sears Companies, who were induced to order products with no intention of paying for the product and refusing to pay for the

ordered product.. He further interfered with contracts, with suppliers, specifically Minnesota Corn Processors.

173.    Jeff Johnson convinced Howard Sears to advise the Sears Companies, IMUS, Innovative and Mountain Products that he would indemnify them in case of legal action to further induce them to terminate their relationships.

174.    That Howard Sears, at the advise of Jeff Johnson, lent money to Mountain Products and was putting pressure on them in reference to their dealings with Ice Ban America.

175.    That Jeff Johnson and Howard Sears told Mountain Products that they were going to financially destroy Ice Ban America and IBAC and force them to sell them their patent rights for their products to Sears.

176.    Jeff Johnson and Howard Sears provided Todd Bloomer of Mountain Products with a sham defense for his delay in the payments.

177.    That Jeff Johnson and Howard Sears promised Ice Ban America and IBAC distributors a larger territory and better terms if they helped destroy Ice Ban America and IBAC.

178.    That based upon the promises of Jeff Johnson and Howard Sears,  Mountain Products ordered $97,000.00 worth of product from Ice Ban America, received it, sold and/or used all or most of it, and delayed payment. IMUS and Innovative ordered over $250,000.00 of product, received it, sold it, received payment on it, and refused to pay for it.

179.    That this interference with Ice Ban America's relationships have caused damages in excess of $500,000.00.

180.    That these actions were willful, wanton and done with malice aforethought.

Wherefore Ice Ban America prays for damages greater than $500,000.00 plus punitive damages and costs, interest and attorney's fees and all other relief that this court deems fair and just.

## COUNT 20

### CONSPIRACY - JEFFREY JOHNSON

181.    ICE BAN AMERICA, INC. and IBAC reallege Paragraphs 1 - 46.

182.    Howard Sears, the Sears Companies, Greg Baun, IMUS, Innovative and Jeff Johnson formulated a plan to put Ice Ban America and IBAC out of business in October and November of 1998.

183.    Such parties agreed to use illegal methods including slander, civil theft, intentional breach of contracts, violation of agreements of confidentiality, breach of fiduciary duties, trademark infringement, and tortiously interfering with advantageous business relationships and contract to put Ice Ban America and IBAC out of business.

184.    That the parties to this conspiracy knew that what they were doing was illegal and improper.

185.    The parties to this conspiracy aided and abetted each other in their actions, and took numerous actions in furtherance of the conspiracy as alleged in more detail above.

186.    The parties actions have caused damage to Ice Ban America and IBAC in excess of $5,000.000.00.

187.    Such parties did their actions knowingly, willfully, wantonly and with malice aforethought.

WP023983;1                                                 - 46 -

188.   Ice Ban America and IBAC dealt in good faith with all parties and took no action to cause or justify the actions of the parties to this court.

WHEREFORE Ice Ban America and IBAC pray for damages against Jeffrey Johnson greater than $5,000,000.00 plus punitive damages, interest, costs and attorney's fees and all other relief that this court may deem fair and just.

Respectfully submitted,

THOMAS F. RYAN, P.A.
14041 U.S. Highway One, Suite E
Juno Beach, Florida  33408
Telephone:  (561) 694-6945

By: _____
     Thomas F. Ryan, Esquire
     Florida Bar No. 293180

AKERMAN, SENTERFITT & EIDSON, P.A.
Phillips Point - East Tower
777 South Flagler Drive, Suite 900
West Palm Beach, Florida  33401
Telephone:  (561) 659-5990

By: _____
     James M. McCann, Jr.
     Florida Bar No. 182545

WP023983;1                           - 47 -

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was served by U.S. Mail, postage prepaid, to all persons listed on the attached Service List, this 2 2ᴺᴰ day of July 1999.

THOMAS F. RYAN, P.A.
14041 U.S. Highway One, Suite E
Juno Beach, Florida  33408
Telephone:  (561) 694-6945

By: _____
    Thomas F. Ryan, Esquire
    Florida Bar No. 293180

AKERMAN, SENTERFITT & EIDSON, P.A.
Phillips Point - East Tower
777 South Flagler Drive, Suite 900
West Palm Beach, Florida  33401
Telephone:  (561) 659-5990

By: _____
    James M. McCann, Jr.
    Florida Bar No. 182545

WP023983;1

- 48 -



# UNITED STATES DISTRICT COURT
## Southern District of Florida

UNITED STATES OF AMERICA

           Plaintiff,

   V.

WARREN D. JOHNSON, JR.,

         Defendant.

## VERDICT

Case Number: 98-8039-CR-RYSKAMP

We, the Jury, find the Defendant, Warren D. Johnson, Jr.,

as to Count 1:    GUILTY _Yes_    NOT GUILTY _____

as to Count 2:    GUILTY _Yes_    NOT GUILTY _____

as to Count 3:    GUILTY _Yes_    NOT GUILTY _____

as to Count 4:    GUILTY _Yes_    NOT GUILTY _____

as to Count 5:    GUILTY _Yes_    NOT GUILTY _____

as to Count 6:    GUILTY _Yes_    NOT GUILTY _____

as to Count 7:    GUILTY _Yes_    NOT GUILTY _____

SO SAY WE ALL.

_____
Foreperson's Signature

_____
Foreperson Print Name

_____
Date

MAR-25-98  17:12    FROM-                                      T-937   P 02/09   F-194

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# 98-8039 CR-RYSKAMP

UNITED STATES OF AMERICA,            )    Case No.
                                     )
                                     )              18 USC 152
                                     )              18 USC 1014
                                     )              18 USC 1957
v.                                   )              18 USC 982
                                     )
                                     )
                                     )    Magistrate Judge  MAGISTRATE JUDGE
WARREN D. JOHNSON, JR.               )                      VITUNAC
                                     )
            Defendant.               )    I N D I C T M E N T
                                     )

The Grand Jury charges that:

## COUNT 1

### BANKRUPTCY FRAUD

From on or about September 26, 1992, to on or about March

29, 1993, at Palm Beach County, in the Southern District of

Florida and elsewhere, the defendant,

**WARREN D. JOHNSON, JR.**

did knowingly and fraudulently conceal and cause to be concealed

from creditors and from the United States Trustee certain

property belonging to the bankruptcy estate of Warren D.

Johnson, Jr., case no. 92-33339-BKC-RAM, in the United States

Bankruptcy Court for the Southern District of Florida, that

is, an interest in a parcel of real property along the St. Lucie

River in Palm City, Florida, commonly known as Bay Pointe

Estates, including an interest in profits from the property

pursuant to a trust agreement dated on or about October 31, 1991.

All in violation of Title 18, United States Code, Section

152(1).

## COUNT 2

## LOAN APPLICATION FRAUD

On or before April 17, 1991, at Broward County, in the Southern District of Florida and elsewhere, the defendant,

### WARREN D. JOHNSON, JR.

did knowingly make a false statement or report to Southeast Bank, an institution whose deposits were insured by the Federal Deposit Insurance Corporation, for the purpose of influencing the action of Southeast Bank, by presenting to Southeast Bank a Statement of Financial Condition dated January 2, 1991, upon an application for an extension of a loan in the amount of approximately $600,000 related to a property known as the Retirement Facility at Palm-Aire located in Pompano Beach, Florida, on which the defendant claimed total assets of approximately $13,904,899 and total liabilities of approximately $1,110,000, which information the defendant then and there well knew was not true and correct; that is, as the defendant then and there well knew, the Statement of Financial Condition failed to disclose certain liabilities, including but not limited to:

1) a liability in the amount of approximately $557,933 to Great Western Bank, incurred in or about 1986, relating to a loan on an apartment complex;

2) a liability in the amount of approximately $100,000 to J.J. Dorbel Corporation, incurred in or about 1986, relating to a second mortgage on an apartment complex;

3) a liability in the amount of approximately $7,175 to First

2

USA Bank, incurred in or about December, 1990, for credit card charges; and

4) a liability in the amount of approximately $4,295 to Republic National Bank, incurred in or about December, 1990, for credit card charges.

All in violation of Title 18, United States Code, Section 1014.

## COUNTS 3 - 7

## MONEY LAUNDERING

On or about the dates enumerated below as to each Count, at Palm Beach County, in the Southern District of Florida and elsewhere, the defendant,

### WARREN D. JOHNSON, JR.

did knowingly engage and attempt to engage in monetary transactions affecting interstate or foreign commerce in criminally derived property of a value greater than $10,000 which was derived from specified unlawful activity, namely bankruptcy fraud, in violation of Title 18, United States Code, Section 152(1), as more fully described below:

| COUNT | DATE | FINANCIAL TRANSACTION |
|-------|------|----------------------|
| 3 | 3/24/94 | A check (no. 2023) from a trust account of the law firm of McCarthy, Summers, Bobko, McKey & Bowen, P.A. in the amount of approximately $250,000, representing proceeds of the sale of lot 33, Bay Pointe Estates, and deposited into American Bank of Martin County was wire transferred to Admiralty Bank, Palm Beach Gardens, and credited to account no. 0300125887 in the name of Linkous Corporation. |

3

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| 4 | 3/25/34 | Approximately $250,000 from account no. 0300125887 in the name of Linkous Corporation at Admiralty Bank, Palm Beach Gardens, Florida, was wire transferred to M & T Bank, Lyndonville, New York and credited to account no. 7942247340 in the name of Warren Johnson, Sr. |
| 5 | 3/31/94 | A check (no. 4152), dated March 28, 1994, in the amount of approximately $125,000 from account no. 7942247340 in the name of Warren Johnson, Sr. at M & T Bank, Lyndonville, New York was used to credit account no. 1002141708 in the name of Dianne Johnson at Riverside Bank, Fort Pierce, Florida in the amount of approximately $103,600. |
| 6 | 5/5/94 | Approximately $100,000 from account no. 7942247340 in the name of Warren Johnson, Sr. at M & T Bank, Lyndonville, New York, was wire transferred to Riverside Bank, Fort Pierce, Florida and credited to account no. 1002141708 in the name of Dianne Johnson. |
| 7 | 4/1/9? | A check (no. 4484) in the amount of approximately $19,500 from account no. 7942247340 in the name of Warren Johnson, Sr. at M & T Bank, Lyndonville, New York, was credited to account no. 1002141708 in the name of Dianne Johnson at Riverside Bank, Fort Pierce, Florida. |

All in violation of Title 18, United States Code, Section 1957.

## COUNT 8

### FORFEITURE OF PROCEEDS OF BANKRUPTCY FRAUD

The allegations contained in Counts Three through Seven of this Indictment are realleged and incorporated by reference as though fully set forth herein, for the purpose of alleging

4

forfeiture pursuant to the provisions of Title 18, United States Code Section 982.

As a result of the foregoing offenses, that is violations of Title 18, United States Code, Section 1957, the defendant,

### WARREN D. JOHNSON, JR.

shall forfeit to the United States all property real and personal involved in the aforestated offenses and all property traceable to such property, including, but not limited to, $250,000 in United States currency and all interest and proceeds traceable thereto, in that such sum in aggregate is property which was involved in the aforestated offenses or is traceable to such property.

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a) cannot be located upon the exercise of due diligence;

b) has been transferred or sold to, or deposited with, a third person;

c) has been placed beyond the jurisdiction of the Court;

d) has been substantially diminished in value; or

e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 (b)(1) to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property, including but not limited to:

1) any interest of any kind in property, real and personal, located at 511 S.W. Bay Pointe Circle, Palm City, Florida;

2) any interest of any kind in a parcel of real property along

5

the St. Lucie River in Palm City, Florida, commonly known as Bay
Pointe Estates, including an interest in profits from the property
pursuant to a trust agreement dated on or about October 31, 1991;

3) any interest of any kind in a property or any entities
related to a property known as the Retirement Facility at Palm-
Aire, located in Pompano Beach, Florida;

4) any interest of any kind in Ice Ban America, Inc.; and

5) any interest of any kind in a real estate development
commonly known as Grand Turk Harbour, located on Grand Turk Island,
in the Turks and Caicos Islands.

All pursuant to Title 18, United States Code, Section 982.


A TRUE BILL


FOREPERSON


THOMAS E.  SCOTT
UNITED STATES ATTORNEY


CAROLYN BELL
ASSISTANT UNITED STATES ATTORNEY


6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CR-RYSKAMP
98 - 8039

UNITED STATES OF AMERICA

v.

WARREN D. JOHNSON, JR

**Court Division:** (Select One)

___ **Miami** ___ Key West
___ FTL   x WPB   FTP ___

CASE NO. _____

CERTIFICATE OF TRIAL ATTORNEY*

MAGISTRATE JUDGE
VITUNAC

Related Case Information:
SUPERSEDING                    Yes ___
New Defendant(s)               Yes ___   No ___
Number of New Defendants
Total number of counts

I do hereby certify that

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:                     No   X _____
     List language and/or dialect _____

4.   This case will take   10   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:
     (Check only one)                          (Check only one)

| | | | | |
|---|---|---|---|---|
| I   | 0 to 5 days | ____ | Petty | ____ |
| II  | 6 to 10 days | X | Minor | ____ |
| III | 11 to 20 days | ____ | Misdem. | ____ |
| IV  | 21 to 60 days | ____ | Felony | X |
| V   | 61 days and over | ____ | | |

6.   Has this case been previously filed in this District Court? (Yes or No)  NO
If yes:

Judge: _____   Case No. _____   ( Attach copy of dispositive order)

Has a complaint been filed in this matter? (Yes or No) NO
If yes:

Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____ District of _____

7.   This case originated in the U.S. Attorney's office prior to August 16, 1985
     (Yes or No) NO _____

*Carolyn Bell*

CAROLYN BELL
ASSISTANT UNITED STATES ATTORNEY
Admin. No. A5500286

*Penalty Sheet(s) attached

REV 12/12/96
N:\WOO\MARTIN\CERTRIAL.FRM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

Defendant Name: WARREN D. JOHNSON, JR.

Case No.: 98-8039CR-RYSKAMP    MAGISTRATE JUD.
VITUNAC

Count #1

Max. Penalty: 5 YEARS $250,000 FINE

==================================================

Count #2

Max. Penalty: 30 YEARS $1,000,000 FINE

==================================================

Count #3-#7

Max. Penalty: 10 YEARS $250,000 FINE

==================================================

Count

Max. Penalty:

==================================================

Count

Max. Penalty:

==================================================

*This is merely a preliminary estimate of the maximum possible incarceration. It does not include any other possible consequences including but not limited to fine, special assessment, restitution, special parole, probation, supervised release, etc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

WARREN DOUGLAS JOHNSON, JR.,

          Debtor.

_____/

SONEET R. KAPILA, Trustee,

          Plaintiff,

vs.

WARREN DOUGLAS JOHNSON, JR.,
ADAM BROWN, JOYCE JOHNSON,
WARREN JOHNSON, SR.,
LINKOUS CORPORATION, DIANNE
JOHNSON, KELLY BROWN, JEFFREY
JOHNSON, LYNNE JOHNSON,
PAUL JOHNSON, MARK JOHNSON,
PATRICIA WELLSPEAK, SHARON
PRATT, LAWRENCE PRATT, HARBOUR
FUNDING PARTNERS, MEDICAL COLLEGE
FUND, LTD., WINDMILLS PLANTATION
FUND, LTD., HAWK'S NEST PLANTATION
FUND, LTD., REED INTERNATIONAL
FUND, LTD., RYDER SECURITIES, LTD.,
MARLIN PRESERVATION FUND, LTD.,
HARVARD FUND LIMITED, MERCHANT
TRUST FUND LIMITED, and GRAND
TURK HARBOUR  DEVELOPMENTS, LTD.,

          Defendants.

_____/

Case No. 92-33339-BKC-SHF

Chapter 7

Adv. Proc. No. _____

**COMPLAINT FOR AN ACCOUNTING AND TURNOVER OF
PROPERTY OF THE ESTATE, TO AVOID AND RECOVER
FRAUDULENT TRANSFERS, TO REVOKE DISCHARGE AND FOR INJUNCTION**

**AND**

**EMERGENCY REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

1

**EXHIBIT "2"**

The plaintiff, Soneet R. Kapila, trustee, sues the defendants, Warren Douglas Johnson, Jr., Adam Brown, Joyce Johnson, Warren Johnson, Sr., Linkous Corporation, Dianne Johnson, Kelly Brown, Jeffrey Johnson, Paul Johnson, Mark Johnson, Patricia Wellspeak, Sharon Pratt, Lawrence Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments Limited, and states:

1.      The plaintiff is the trustee in this chapter 7 case.

2.      The defendants are, as follows:

a.      The defendant Warren Johnson, Jr. ("Johnson" or "the debtor") is the chapter 7 debtor in this proceeding.

b.      The defendant Adam Brown is the debtor's son-in-law, and the husband of the defendant Kelly Brown.

c.      The defendant Warren Johnson, Sr. is the debtor's father.

d.      The defendant Joyce Johnson is the debtor's mother.

e.      The defendant Dianne Johnson is the debtor's wife.

f.      The defendants Mark Johnson is the debtor's son.

g.      The defendants Paul and Jeffrey Johnson are the debtor's brothers.

h.      The defendant Patricia Wellspeak is the debtor's daughter.

i.      The defendants Sharon and Lawrence Pratt are the debtor's sister and her husband.

j.      The defendant Linkous Corporation is a corporation.

k.      The defendant Harbour Funding Partners is a Nevada limited partnership, as to which Charter Media Group, Ltd., is the corporate general partner.

2

l.     The defendants Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., and Marlin Preservation Fund, Ltd. are companies registered under the laws of the Turks and Caicos Islands.

m.     The defendant Harvard Fund Limited is a corporation incorporated under the laws of the nation of Nevis.

n.     The defendant Merchant Trust Fund, Ltd. is a corporation incorporated under the laws of the nation of Nevis.

o.     The defendant Grand Turk Harbour Developments Limited ("GTH") is a corporation, the directors of which are Richard Grund, Gerald Bourne, and Andrew Honeycut.

3.     Johnson commenced this case by filing a chapter 7 petition on October 2, 1992.  He received a discharge on March 29, 1993.  The trustee reopened the case on January 28, 1994 so that he could pursue recovery of an unscheduled asset.  The case was closed on December 18, 1996.

4.     On December 8, 1998, the trustee moved to reopen this case and an order was entered on December 11, 1998 reopening the case to administer additional assets and vacating the final decree.

5.     This is an action for turnover of property of the estate, to avoid transfers pursuant to 11 U.S.C. §544(b), §548(a) and to recover the value of the transferred interests pursuant to 11 U.S.C. §550(a); and to revoke discharge pursuant to 11 U.S.C. §727(d).  This complaint also seeks an injunction prohibiting the defendants from further transferring  or otherwise encumbering estate assets.

6.     The court has jurisdiction over this matter pursuant to 28 U.S.C. §1334; 28 U.S.C. §157(b)(1), (2)(A), (E), and (d); and §727(d) and the district court's order of reference.

3

This is a core matter.

### General Allegations

7.    On November 25, 1998, after a lengthy investigation and a trial at which this trustee testified, Johnson was convicted on seven counts of bankruptcy fraud, loan application fraud and money laundering in the United States District Court for the Southern District of Florida ("the bankruptcy fraud trial").  The case was prosecuted by the southern district's Criminal Bankruptcy Fraud Coordinator and investigated by the Federal Bureau of Investigation in Fort Pierce, Florida.  Johnson was sentenced on June 23, 1999 by District Judge Kenneth L. Ryskamp to 97 months imprisonment to be followed by five years supervised release plus payment of restitution and reimbursement of the cost of the federal public defender.  Earlier, shortly after the conviction, the district judge had ordered Johnson to forfeit $250,000, representing laundered proceeds of the asset concealed from his bankruptcy estate.

8.    Johnson was a real estate developer in Palm City, Florida.  In his chapter 7 bankruptcy proceeding commenced in 1992, he listed over $7.2 million in debts and no assets available to creditors.

9.    Contrary to the debtor's schedules filed in October, 1992 which showed no assets available to creditors, Johnson in fact held a hidden interest in a luxury real estate development along the St. Lucie River in Palm City, Florida, commonly known as Bay Pointe Estates. The debtor also held an interest in profits derived from that property because at the time his bankruptcy case commenced he expected to receive more than $1.2 million in profits from the sale of property in Bay Pointe Estates pursuant to a trust agreement dated October 31, 1991.

10.    More specifically, an accurate chronology of relevant events follows.

4

a.      In 1978, Johnson commenced a chapter VII proceeding under the former Bankruptcy Act, and received his discharge in 1979;

b.      Between 1986 and 1988, Johnson acquired an interest in at least four separate properties, including Haverhill Court Apartments, and property in Orange and Seminole Counties;

c.      Beginning in December, 1989, Johnson developed and owned The Preserve at Palm-Aire Retirement Facility ("The Preserve"), with at least $28,000,000 outside bondholders' financing guaranteed by Johnson.

d.      Between 1989 and 1992, Johnson was sued: by the Federal Deposit Insurance Corporation (FDIC), to foreclose a $473,000 mortgage loan against his property in Seminole County; by the RTC to foreclose a $261,000 mortgage loan against his property in Orange County; and by J.J. Corbel Corp. to foreclose a $100,000 mortgage loan against the Haverhill Court Apartments; by Great Western to foreclose a $1,076,000 mortgage loan against the Haverhill Court Apartments; by the RTC for foreclosure of a $575,000 mortgage loan against property in Bay Pointe, Palm City, in Martin County; Ray Loesche for $280,000 borrowed by Johnson in connection with The Preserve; and by Southeast Bank and by other bondholders on The Preserve;

e.      On June 20, 1991, the debtor sold Lot 25, Bay Pointe, for $135,000 and used the proceeds to pay personal debts.

f.      On September 25, 1991, Johnson won a lawsuit he brought to enforce a purchase option, which gave him the right to purchase additional property in Bay Pointe Estates and Otter's Run subdivision, also in Martin County, worth at least $1,000,000, for $450,000. This asset, if discovered by creditors, would have been exposed to levy in any of several pending suits seeking to recover money judgments against Johnson on liquidated

5

debts which were unquestionably in default.

g.     To generate value from the purchase option, Johnson negotiated with two potential investors, Walt Harber and Jim Lindsey ("Harber and Lindsey"), who agreed to invest $500,000 in the purchase and development of the optioned property at Bay Pointe Estates and Otter's Run, and to form with Johnson the Bay Pointe Estates Land Trust.

h.     The agreement between Johnson and Harber and Lindsey provided that Harber and Lindsey would receive a 110% return of their investment, and in addition would receive 50% of the profits from the sale of the property. Pursuant to the agreement Johnson was to receive the other 50% of the profits, and his son-in-law, Adam Brown ("Brown"), would receive the title to the Otter's Run parcel, which Johnson paid for with monies advanced by Harber and Lindsey. Bay Pointe Estates was conveyed to the Bay Pointe Estates Land Trust and Otter's Run was conveyed to Adam Brown

i.     Between October 31 and November 1, 1991, Johnson assigned his option interest in the Bay Pointe Estates property to Brown, and placed Brown into the Bay Pointe Estates Land Trust in Johnson's place. Johnson received no consideration for transferring this asset.

j.     In September 1992, nearly $4 million in *in personam* judgments were entered against Johnson.

k.     On October 2, 1992 the debtor commenced his second chapter 7 case, but did not disclose the transfer of his interest in the Bay Pointe Estates and Otter's Run property to his son-in law that had occurred during the preceding year. Johnson received a discharge from his debts on March 29, 1993.

l.     On March 8, 1994, the first Bay Pointe Estates lot developed by Bay Pointe Estates Land Trust on land purchased through the exercise of Johnson's option was

6

sold for $605,000, producing net sale proceeds to Johnson of approximately $250,000.

11.    On or about March 24, 1994, the debtor began a scheme to launder the $250,000 that he received from the sale of the first Bay Pointe Estates lot, as follows:

a.    On March 24, 1994, a check in the amount of $250,000, from proceeds of the sale of Lot 33, Bay Pointe Estates, was deposited into American Bank of Martin County and then wire transferred to Admiralty Bank, Palm Beach Gardens, and credited to account no. 0300125887 in the name of Linkous Corporation.

b.    On March    25, 1994, approximately $250,000 from the Linkous Corporation account no. 0300125887 was wire transferred to M&T Bank, Lyndonville, NY and credited to account no. 7942247340 in the name of Warren Johnson,  Sr. (the debtor's father).

c.    On March 31, 1994, a check dated March 28, 1994 in the amount of approximately $125,000 from the Warren Johnson, Sr. account no. 7942247340 at M&T Bank was used to credit account no. 1002141708 in the name of Dianne Johnson (debtor's wife) at Riverside Bank in Fort Pierce, FL, in the amount of approximately $103,600.  An additional $100,000 was transferred in the same manner on May 5, 1994, and another $19,000 was transferred in the same manner in April, 1996.

d.    With the funds described in paragraph c above, which were proceeds of a bankruptcy fraud, Johnson invested $22,500 in Ecological Snow Control, a predecessor of Ice Ban America, Inc., and $92,085 in Ice Ban, Inc. and Ice Ban America, and used the balance of the funds to sustain his and his wife's lifestyle while he was working to develop Ecological Snow Control and Ice Ban America, Inc.

e.    On August 15, 1996, 6,400,000 restricted shares of Ice Ban America, Inc. stock were issued to Johnson, and on July 29, 1997, another 1,400,000 restricted

7

shares were issued to Johnson.   On information and belief, additional unrestricted shares were issued to Johnson as well.  At various dates in 1996, 1997, and 1998, Johnson caused the shares to be reissued to the other defendants in the manner reflected on Exhibit "A" while retaining control and secret ownership of the stock, which is now known as Natural Solutions Corp.  Among these transactions, on January 5, 1998, 3,925,000 of these shares of Ice Ban America, Inc. stock, in Johnson's name, were canceled and reissued at Johnson's request to Harbour Funding Partners ("Harbour Funding"), a Nevada limited partnership formed December 31, 1997.   The general partner of HFP is Charter Media Group, Ltd. ("Charter Media").  Johnson is president of Charter Media.

   f. On March 2, 1998, at a time when Johnson knew that he was being investigated for the bankruptcy crime, Johnson, as president of Charter Media, signed a stock or bond power requiring reissuance of Harbour Funding's 3,925,000 million shares described in subparagraph (e) above, to six corporations registered in the Turks and Caicos Islands, which is an independent island nation in the Caribbean Sea.   The corporations, and the numbers of shares each received, is:

   —Medical College Fund, Ltd., 700,000 shares

   —Windmills Plantation Fund, Ltd., 625,000 shares

   —Hawk's Nest Plantation Fund, Ltd., 600,000 shares

   —Reed International Fund, Ltd., 750,000 shares

   —Ryder Securities, Ltd., 750,000 shares

   —Marlin Preservation Fund, Ltd., 500,000 shares

Turks and Caicos Islands is commonly known to be an international tax and banking haven with strict financial secrecy laws which generally impede further discovery of the ownership

of companies registered there.

     g.    In September 1997, IBAC Corp. a/k/a Ice Ban Canada issued 6,100,000 shares of its stock to Johnson. At various dates in 1997 and 1998, Johnson caused the shares to be reissued to the other defendants in the manner reflected on Exhibit "B" while retaining control and secret ownership of the IBAC stock.

    12.    Based upon the above transactions, Johnson owns a significant interest in Natural Solutions Corp. (f/k/a Ice Ban America, Inc.), whose stock is currently selling for between 95¢ and $1.25 per share, and in IBAC, whose stock is currently selling for roughly 25¢ per share, making these shares worth millions of dollars, depending on the timing of stock sales which may be permissible as the restrictions are lifted. Johnson's acquisition of both stocks was in consideration of his cash investments in Ecological Snow/Ice Ban America and his "sweat equity" resulting from being able to develop and promote those companies while his living expenses were sustained by the $250,000 derived from the sale of the Bay Pointe Estates property, which was itself the fruit of the purchase option, which was in turn a concealed asset of Johnson's bankruptcy estate.

    13.    As described above, on October 31 and November 1, 1991, Johnson assigned his interest in Bay Pointe Estates and Otter's Run to Adam Brown ("the transfer"). At the time of the transfer, no transfer taxes were paid on the conveyance and Johnson received no consideration in exchange for the transfer.

    14.    On the day the debtor transferred the property to Brown, Johnson was insolvent.

    15.    From before 1991 when the debtor determined to transfer the property, he knew that his ability to repay the obligations described in paragraph 10(d) above, and the other obligations to creditors scheduled in his 1992 bankruptcy case, was impaired.

16.    Despite the transfer of his interest to Brown, Johnson did receive $250,000 in profits from the sale of the Bay Pointe Estates property, according to his agreement with Harber and Lindsey. These funds were proceeds derived from an asset concealed from his bankruptcy trustee ("the proceeds").

17.    Johnson used the proceeds, in the manner described in paragraph 12, to acquire his interest in the Ice Ban America, Inc. stock and IBAC stock, now held by other defendants, but as to which Johnson remains in control.

COUNT I

## For Turnover of Property of the Estate [§542]

### (Debtor's Interest in Bay Pointe Estates and Otter's Run)

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

18.    Johnson was the true owner of the purchase option interest in Bay Pointe Estates and Otter's Run which he purported to transfer to Adam Brown, but Johnson retained full control over and right to convey or realize upon the purchase option, and retained the right to any profits to be realized from the purchase option. Consequently the purported transfer to Brown was a sham, and title to the optioned property remained in Johnson at the time his 1992 bankruptcy case commenced.

19.    The profits to be shared under the Bay Pointe Estates agreement described in paragraphs 10(g) and (h) rightfully belong to the trustee because they are the profits of the purchase option.

20.    Because the contractual interest in the Bay Pointe Estates property and the fee interest in the Otter's Run property was unscheduled in the bankruptcy case, it was not deemed abandoned by the trustee at the time the case closed.

21.    Pursuant to 11 U.S.C. §542 of the Bankruptcy Code, the trustee demands that

10

the defendants immediately deliver the property or the value of the property, to the trustee.

WHEREFORE, the trustee seeks the entry of a judgment directing the turnover of all property which represents the profits or proceeds of the debtor's former purchase option interest in Bay Pointe Estates and Otter's Run.

## COUNT II

### For an Accounting

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

22.    The trustee is unable to trace the profits and proceeds of the debtor's former purchase option interest in Bay Pointe Estates without the debtor's assistance in providing an accounting.

23.    The trustee has demanded that the debtor provide an accounting, but the debtor has not provided an accounting.

WHEREFORE, the plaintiff seeks the entry of a judgment requiring the debtor to produce a full accounting tracing all the funds and other profits and proceeds of the debtor's former purchase option interest in Bay Pointe Estates to the present day.

## COUNT III

### Turnover of Property of the Estate [§542]

#### (Debtor's stock interest in Ice Ban America, Inc.)

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

24.    Johnson was the true owner of the purchase option interest in Bay Pointe Estates which he purported to transfer to Adam Brown, but Johnson retained full control over and right to convey or realize upon the purchase option, and retained the right to any profits to be realized from the purchase option.  Consequently the purported transfer to Brown was a sham, and title to the purchase option remained in Johnson at the time his 1992 bankruptcy

11

case commenced.

25.     The profits to be shared under the agreement described in paragraphs 10(g) and (h) rightfully belong to the trustee because they are the profits of the purchase option.

26.     The debtor acquired the shares in Ice Ban America, Inc. and IBAC with the profits of the purchase option.

27.     Although the stock is now titled in the names of others, it remains within the control of the debtor or of persons whose actions in connection with the stock is in the control of the debtor, and is therefore still an asset of the debtor.

28.     Pursuant to 11 U.S.C. §542 of the Bankruptcy Code, the trustee demands that the defendants immediately deliver the Natural Solutions Corp. stock and IBAC stock, with stock powers properly made out, to the trustee.

WHEREFORE, the trustee seeks the entry of a judgment directing the turnover of the Natural Solutions Corp. stock and the IBAC Corp. stock, with stock powers properly made out by the stockholders to the trustee, and alternatively entering judgment for the value of the stock.

## COUNT IV

### Alternatively, to Recover Fraudulent Transfer [§544(b)]

(versus Adam Brown, Warren Johnson, Sr., Joyce Johnson, Jeffrey Johnson, Mark Johnson, Paul Johnson, Linkous Corporation, Dianne Johnson, Kelly Brown, Patricia Wellspeak, Lawrence Pratt, Sharon Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments, Ltd.)

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

29.     The transfer of the debtor's purchase option to Brown described in paragraph 10 was made for less than reasonably equivalent value in exchange, while the debtor was

insolvent, or when he was incurring debts beyond his ability to repay as they matured.

30.    The transfer was made with the intent to hinder, delay or defraud the debtor's creditors.

31.    The transfer was a fraudulent transfer under 11 U.S.C. §544(b), based on Fla. Stat. §726.105, .106, and .108.

32.    The property transferred having since been disposed of by the initial transferee, its profits and proceeds are recoverable by the estate pursuant to 11 U.S.C. §550(a)(1) and (a)(2).

33.    Each of the following defendants participated as an immediate or mediate transferee of the property: Adam Brown, Warren Johnson, Sr., Joyce Johnson, Jeffrey Johnson, Mark Johnson, Paul Johnson, Linkous Corporation, Dianne Johnson, Kelly Brown, Patricia Wellspeak, Lawrence Pratt, Sharon Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments, Ltd.

Wherefore, the trustee demands judgment against Adam Brown avoiding the transfer, and against Warren Johnson, Sr., Joyce Johnson, Jeffrey Johnson, Mark Johnson, Paul Johnson, Linkous Corporation, Dianne Johnson, Kelly Brown, Patricia Wellspeak, Lawrence Pratt, Sharon Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments, Ltd. avoiding the transfer of the profits and proceeds, and awarding the profits and proceeds to the estate pursuant to 11 U.S.C. §550(a).

13

## COUNT V

### Alternatively, to Recover Fraudulent Transfer [§548(a)]

(versus Adam Brown, Warren Johnson, Sr., Joyce Johnson, Jeffrey Johnson, Mark Johnson, Paul Johnson, Linkous Corporation, Dianne Johnson, Kelly Brown, Patricia Wellspeak, Lawrence Pratt, Sharon Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments, Ltd.)

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

34.    The transfer of the debtor's purchase option to Brown described in paragraph 10 was made with the actual intent to hinder, delay or defraud the debtor's creditors.

35.    The transfer was made for less than reasonably equivalent value while the debtor was insolvent or while he believed he was incurring debts beyond his ability to pay as they became due.

36.    The transfer is a fraudulent transfer under 11 U.S.C. §548(a)(1) or (2).

37.    The property transferred having since been disposed of by the initial transferee, its profits and proceeds are recoverable by the estate pursuant to 11 U.S.C. §550(a)(1) and (a)(2).

38.    Each of the following defendants participated as an immediate or mediate transferee of the property: Warren Johnson, Sr., Joyce Johnson, Jeffrey Johnson, Mark Johnson, Paul Johnson, Linkous Corporation, Dianne Johnson, Kelly Brown, Patricia Wellspeak, Lawrence Pratt, Sharon Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments, Ltd.

Wherefore, the trustee demands judgment against Adam Brown avoiding the transfer,

14

and against Warren Johnson, Sr., Joyce Johnson, Jeffrey Johnson, Mark Johnson, Paul Johnson, Linkous Corporation, Dianne Johnson, Kelly Brown, Patricia Wellspeak, Lawrence Pratt, Sharon Pratt, Harbour Funding Partners, Medical College Fund, Ltd., Windmills Plantation Fund, Ltd., Hawk's Nest Plantation Fund, Ltd., Reed International Fund, Ltd., Ryder Securities, Ltd., Marlin Preservation Fund, Ltd., Harvard Fund Limited, Merchant Trust Fund Limited, and Grand Turk Harbour Developments, Ltd. avoiding the transfer of the profits and proceeds, and awarding the profits and proceeds to the estate pursuant to 11 U.S.C. §550(a).

## COUNT VI

### To Revoke Discharge [§727(d)]

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

39.    The debtor failed to schedule as an asset of his estate the purchase option described in paragraph 10.

40.    The debtor's failure to schedule the purchase option described in paragraph 10 was an act of concealment done with the intent to defraud creditors, that subjects the debtor to loss of discharge pursuant to 11 U.S.C. §727 (a)(2), and the plaintiff did not know of such fraud until after the granting of the discharge.

41.    The debtor's failure to schedule the purchase option described in paragraph 10 was an act of concealment done with the intent to defraud creditors, that subjects the debtor to loss of discharge pursuant to 11 U.S.C. §727 (a)(2).

42.    The debtor's acquisition of the purchase option described in paragraph 10 constitutes the acquisition of property that is property of the estate, or property that the debtor became entitled to acquire, that would be property of the estate, and the debtor knowingly and fraudulently failed to report the acquisition of or entitlement to such property,

15

or to deliver or surrender such property to the trustee.

43.     Pursuant to 11 U.S.C. §727(d), the allegations in paragraphs 41 and 42 constitute grounds for the court to revoke the debtor's discharge granted under 11 U.S.C. §727(a).

WHEREFORE, the trustee seeks the entry of a judgment revoking the debtor's discharge.

COUNT VII

Injunction

The allegations in paragraphs 1 through 17 are realleged as if set forth in this count.

44.     The profits and proceeds of the debtor's former purchase option interest in Bay Pointe Estates—specifically including the shares of stock in Ice Ban America, Inc.— were never turned over to the trustee.

45.     The trustee's counsel has served demand upon the debtor's bankruptcy counsel and the debtor's present criminal defense counsel, demanding that the debtor immediately turn over possession of the Ice Ban America, Inc. stock to the trustee for safekeeping. Thus far, the debtor has failed and refused to do so.

46.     At Johnson's sentencing hearing on June 18 and June 23, nearly eight hours of testimony was presented on the issue of whether Johnson is in fact the real owner of the following assets:

—the home of the debtor at 511 S.W. Bay Pointe Circle, Palm City, Florida

—the home of Adam and Kelly Brown in Otter's Run subdivision in Martin County

—the home of Warren D. Johnson Sr. and Joyce Johnson in Orleans, New York

—any remaining profit to be derived from Bay Pointe Estates

—seven unsold lots in Otter's Run subdivision

—bank accounts in the United States, the British West Indies, and Canada

—furniture and cars

—all stock in IBAC Corp. (Ice Ban Canada), Natural Solutions Corp. (Ice Ban America and Ice Ban, Inc.), and Globenet which is either owned by or in the control of a defendant

and consequently whether Johnson lied to both his probation officer and a magistrate judge when he told them that he did not control the stock or have assets of significance, in order to obtain a public defender and to obtain a favorable bail bond. A list of the assets, referred to in Judge Ryskamp's ruling, is attached as Exhibit C. Some of the stock has been further transferred at Johnson's instance, and Johnson and other defendants continue to sell and to attempt to sell the Natural Solutions and IBAC stock despite the stock restrictions. The Globenet stock listed on Exhibit C represents the proceeds of one such sale of Ice Ban America, Inc. stock by defendants Harvard Fund and Merchant Trust Fund.

47.     At the close of the hearing, Judge Ryskamp recited the ruling transcribed in Exhibit D, attached. Among other things, he found that Johnson is the true owner of all the assets on Exhibit C, and warned family members and friends of Johnson who were present that they would be in trouble if they tried to transfer any of the assets other than to provide for payment of restitution. Judge Ryskamp announced further that he deemed the assets all to be property of Johnson's bankruptcy estate, and referred the matter of restitution to the trustee and to this court to make recommendations back to him.

48.     The trustee believes that Johnson's incentive to cooperate with the trustee will diminish greatly as a result of the sentencing, and that his family's willingness to cooperate will likewise diminish. Richard Grund, who testified that defendant Mark

17

Johnson had recently named him the executive director of Grand Turk Harbour Developments Limited ("GTH"), postured immediately after the hearing that the United States Courts' authority would not reach to the Turks & Caicos and Nevis companies. This attitude suggests that Mr. Grund, GTH, and the other offshore corporations will not cooperate and that any injunction must reach as many defendants—who may exert some influence over the offshore corporations—as possible.

49.     Because of the difficulty, or impossibility, of recovering Natural Solutions, IBAC, or Globenet stock from offshore corporations under the laws of the Turks and Caicos Islands or Nevis Island, and because of the risk that the other listed assets could be sold or pledged to bona fide purchasers or to yet another round of Johnson's confederates, the bankruptcy estate will suffer irreparable damage if unable to detain the assets immediately.

50.     For the reasons stated, there is a strong likelihood of success on the merits; the trustee will be irreparably harmed if not granted a preliminary injunction; the nonmoving party will not be irreparably harmed by a preliminary injunction, and such injunction will serve the public interest.

51.     To protect the estate from loss of property, which could be further transferred by offshore corporations and other defendants, and which could suffer loss in value because of fluctuations in the stock market, it is necessary that the court enter a preliminary injunction enjoining the defendants from taking any action in regard to the assets, other than to deliver the stock certificates immediately to the trustee with stock powers properly made to the trustee, and requiring the defendants to provide copies of all documents relating to the stock immediately to the trustee, or alternatively, directing that the ownership of the shares be transferred to the trustee to hold in escrow pending trial without the necessity of obtaining stock powers or other cooperation from the present

18

shareholders.

## NEED FOR EMERGENCY RELIEF

For the reasons stated in this count, the plaintiff submits that the transfer, pledge or other disposition of the assets listed on Exhibit C should be enjoined without hearing, based on the application of collateral estoppel to Judge Ryskamp's finding, and that bond should be waived, and a hearing set on notice to the defendants to consider whether the injunctive relief should be continued, extended or terminated.

WHEREFORE, the trustee seeks the entry of a preliminary injunction granting the relief described, and authorizing such further relief as the court finds just.

Dated:  June 24, 1999

PATRICK S. SCOTT & ASSOCIATES, P.A.
Counsel for Plaintiff
One East Broward Blvd., Suite 1501
Fort Lauderdale, FL  33301
(954) 523-1615

By: _____
　　Patrick S. Scott
　　Fla. Bar No. 290025

19

# NATURAL SOLUTIONS CORP.
# (ICEBAN AMERICA & ICEBAN, INC.)
# WARREN D. JOHNSON, JR.



WARREN D. JOHNSON JR.'S ASSETS
6/18/99

| ASSET | NOMINEE | EST. VALUE |
|---|---|---|
| HOME | Self | $ 139,750 |
| | Dianne Johnson | $ 139,750 |
| BAY POINTE ESTATES | Adam Brown | Unknown |
| OTTER'S RUN | Adam Brown | $ 800,000 |
| FURNITURE | Dianne Johnson | $ 30,000 |
| CARS | Par Auto Sales | Unknown |
| BANK ACCOUNTS | | |
| USA | Dianne Johnson | $ 6,219 |
| British West Indies | Harvard Fund/Mark Johnson | $ 605,483 |
| | Merchants Fund/Mark Johnson | $ 498,032 |
| Union Securities Canada | Harvard Fund/Mark Johnson | $ 84,309 |
| | Merchants Fund/Mark Johnson | $ 93,602 |
| ORLEANS PROPERTY | Warren D. Johnson, Sr. | $ 62,000 |

IBAC CORP. STOCK (Ice Ban Canada) (.25 per share)

| | | |
|---|---|---|
| 220,000 shares | Michael Ball | Unknown |
| 900,000 shares | Dianne Johnson | Unknown |
| 570,000 shares | Dianne Johnson | $ 142,500 |
| 2,000,000 shares | Jeff Johnson | $ 500,000 |
| 200,000 shares | Paul Johnson | $ 50,000 |
| 200,000 shares | Larry & Sharon Pratt | $ 50,000 |
| 200,000 shares | Patricia Wellspeak | $ 50,000 |
| 570,000 shares | Merchants Trust Fund | $ 142,500 |
| 570,000 shares | Harvard Fund, Ltd. | $ 142,500 |

NATURAL SOLUTIONS STOCK (Ice Ban America & Ice Ban, Inc.) ($1.19 per share)

| | | |
|---|---|---|
| 700,000 shares | Medical College Fund | $ 833,000 |
| 625,000 shares | Windmills Plantation Fund, Ltd. | $ 743,750 |
| 600,000 shares | Hawks Nest Plantation Fund | $ 714,000 |
| 750,000 shares | Reed International Fund, Inc. | $ 892,500 |
| 750,000 shares | Ryder Securities Ltd. | $ 892,500 |
| 500,000 shares | Marlin Preservation Fund | $ 595,000 |
| 260,000 shares | Harvard Fund, Ltd. | $ 309,400 |
| 260,000 shares | Merchants Trust Fund | $ 309,400 |
| 100,000 shares | Warren D. Johnson, Sr. | $ 119,000 |
| 284,524 shares | Dianne Johnson | $ 338,584 |
| 100,000 shares | Dianne Johnson | $ 119,000 |

GLOBENET STOCK ($3.00 per share)

| | | |
|---|---|---|
| 200,000 shares | Kelly Brown | $ 600,000 |
| 400,000 shares | Dianne Johnson | $1,200,000 |



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

WARREN DOUGLAS JOHNSON, JR.,

         Debtor.

_____/

SONEET R. KAPILA, Trustee,

         Plaintiff,

vs.

WARREN DOUGLAS JOHNSON, JR.,
ADAM BROWN, JOYCE JOHNSON,
WARREN JOHNSON, SR.,
LINKOUS CORPORATION, DIANNE
JOHNSON, KELLY BROWN, JEFFREY
JOHNSON, LYNNE JOHNSON,
PAUL JOHNSON, MARK JOHNSON,
PATRICIA WELLSPEAK, SHARON
PRATT, LAWRENCE PRATT, HARBOUR
FUNDING PARTNERS, MEDICAL COLLEGE
FUND, LTD., WINDMILLS PLANTATION
FUND, LTD., HAWK'S NEST PLANTATION
FUND, LTD., REED INTERNATIONAL
FUND, LTD., RYDER SECURITIES, LTD.,
MARLIN PRESERVATION FUND, LTD.,
HARVARD FUND LIMITED, MERCHANT
TRUST FUND LIMITED, and GRAND
TURK HARBOUR DEVELOPMENTS, LTD.,

         Defendants.

_____/

Case No. 92-33339-BKC-SHF

Chapter 7

Adv. Proc. No. _____

## ORDER FOR PRELIMINARY INJUNCTION

     THIS MATTER having been considered upon the Complaint and Emergency Request

for Preliminary Injunctive Relief and the findings announced by Judge Kenneth L. Ryskamp on

June 23, 1999, and the court specifically finding that there is a strong likelihood of success on

the merits; that the trustee will be irreparably harmed if not granted a preliminary injunction; that

**EXHIBIT "3"**

the nonmoving parties will not be irreparably harmed by a preliminary injunction, and that such injunction will serve the public interest, it is hereby ORDERED:

1.    The defendants are enjoined from concealing, removing, pledging, selling, transferring, assigning, or otherwise disposing of any property listed on the attached Exhibit "A" pending further order of this court. ~~Although the specific descriptions of the homes are not given in Exhibit "A", this order is intended to include the home of the debtor at 511 S.W. Bay Pointe Circle, Palm City, Florida, the home of Adam and Kelly Brown in Otter's Run subdivision in Martin County, the home of Warren D. Johnson Sr. and Joyce Johnson in Orleans, New York, the seven additional lots in Otter's Run subdivision, and all stock in IBAC Corp. (Ice Ban Canada), Natural Solutions Corp. (Ice Ban America and Ice Ban, Inc.), and Globonet which is either owned by or in the control of any of the defendants.~~

2.    A further hearing will be held before the court at 2:00 p.m. on July 8 1999, before this court, at 701 Clematis Street, Courtroom 6, West Palm Beach, Florida.

3.    Bond for the trustee is waived.  Service of this order shall be sufficient if delivered to the defendants or if served in the manner provided in Fed. R. Bkcy. P. 7004 at least 10 days before the hearing.

ORDERED in the Southern District of Florida, at 3:25 p.m. on June 25, 1999

Steven H. Friedman
U.S. Bankruptcy Court

Copies to:
Patrick S. Scott
U.S. Trustee

990624pOrderInjunction

Atty. Patrick Scott is directed to mail a conformed copy of this order to all interested parties and to file a certificate of service with the clerk of the Bankruptcy Court.

| ASSET | NOMINEE | EST. VALUE |
|---|---|---|
| HOME | Self | $ 139,750 |
|  | Dianne Johnson | $ 139,750 |
| BAY POINTE ESTATES | Adam Brown | Unknown |
| OTTER'S RUN | Adam Brown | $ 800,000 |
| FURNITURE | Dianne Johnson | $ 30,000 |
| CARS | Par Auto Sales | Unknown |
| BANK ACCOUNTS |  |  |
| USA | Dianne Johnson | $ 6,219 |
| British West Indies | Harvard Fund/Mark Johnson | $ 605,483 |
|  | Merchants Fund/Mark Johnson | $ 498,032 |
| Union Securities Canada | Harvard Fund/Mark Johnson | $ 84,309 |
|  | Merchants Fund/Mark Johnson | $ 93,602 |
| ORLEANS PROPERTY | Warren D. Johnson, Sr. | $ 62,000 |

IBAC CORP. STOCK (Ice Ban Canada) (.25 per share)

| shares | nominee | value |
|---|---|---|
| 220,000 shares | Michael Ball | Unknown |
| 900,000 shares | Dianne Johnson | Unknown |
| 570,000 shares | Dianne Johnson | $ 142,500 |
| 2,000,000 shares | Jeff Johnson | $ 500,000 |
| 200,000 shares | Paul Johnson | $ 50,000 |
| 200,000 shares | Larry & Sharon Pratt | $ 50,000 |
| 200,000 shares | Patricia Wellspeak | $ 50,000 |
| 570,000 shares | Merchants Trust Fund | $ 142,500 |
| 570,000 shares | Harvard Fund, Ltd. | $ 142,500 |

NATURAL SOLUTIONS STOCK (Ice Ban America & Ice Ban, Inc.) ($1.19 per share)

| shares | nominee | value |
|---|---|---|
| 700,000 shares | Medical College Fund | $ 833,000 |
| 625,000 shares | Windmills Plantation Fund, Ltd. | $ 743,750 |
| 600,000 shares | Hawks Nest Plantation Fund | $ 714,000 |
| 750,000 shares | Reed International Fund, Inc. | $ 892,500 |
| 750,000 shares | Ryder Securities Ltd. | $ 892,500 |
| 500,000 shares | Marlin Preservation Fund | $ 595,000 |
| 260,000 shares | Harvard Fund, Ltd. | $ 309,400 |
| 260,000 shares | Merchants Trust Fund | $ 309,400 |
| 100,000 shares | Warren D. Johnson, Sr. | $ 119,000 |
| 284,524 shares | Dianne Johnson | $ 338,584 |
| 100,000 shares | Dianne Johnson | $ 119,000 |

GLOBENET STOCK ($3.00 per share)

| shares | nominee | value |
|---|---|---|
| 200,000 shares | Kelly Brown | $ 600,000 |
| 400,000 shares | Dianne Johnson | $1,200,000 |
| 449,000 shares | Mark Johnson | $1,347,000 |

"C"

June 10, 1999

Natural Solutions Corporation
Attn: Mr. Leo C. Palmer, CFO
1201 U.S. Highway One, Suite 205
North Palm Beach, FL 33408

Re: Rule 144 Filing

Dear Mr. Palmer:

Please recall that some time ago, I sold some shares of Natural Solutions Corporation common stock. There was a question as to how I acquired the shares of stock. Mr. Janke and I have been discussing this need. The transaction took place when Mr. Warren Johnson instructed me to send the amount of $30,000 to another party as payment for the stock. Subsequently, I sent the $30,000 pursuant to Warren's instructions.

Please note the enclosed copy of a cashier's check that was sent as payment for the stock purchase. This cashier's check was discovered after a detailed review of my bank transactions and cashier's check activity. With this information, please authorize the agent, Atlas Stock Transfer Company, to use the provided opinion from Waller, Lansden, Dortsch & Davis to remove the restriction from the remaining 39,000 shares of Natural Solutions Corporation common stock.

Thank you for your assistance in resolving this matter.

Sincerely,

Walter L. Harber
111 Ridgemont Rd.
Johnson City, TN 37601

Enclosure

**EXHIBIT "4"**

908-4926

Burton Wickh

Midland Bank
Buffalo NY

Marine

CYCLE 98    SEQ 00044

Bank of
Tennessee

CORPORATE OFFICE · KINGSPORT, TENNESSEE

Remitter
WALTER HARDER

138870

PAY TO THE
ORDER OF

BURTON WICKHAM

DECEMBER 31 19 96

$ 30,000.00

B*T* 30000 DOLS 00 ETS

DOLLARS

CASHIER'S CHECK
MUST CASHED WITHIN ONE YEAR

⑈138870⑈  ⑈0640270750  970·050⑈⑈

# BALL GROUP INVESTMENT CLUB

Enclosed you will find a copy of the ICE BAN CANADA, INC. Stock Certificate being held in a safety deposit box at Riverside National Bank in Palm City, Florida.

This certificate will be held until the maturation date, which is September 1, 1998.

Upon completion of the proper filing of the documentation, _Dennis Klimer_ will be issued a certificate in the amount of _4,000_ shares.

Sincerely,

_Michael R Ball_

Michael R. Ball

**EXHIBIT "5"**



RESTRICTED STOCK

IBAC CORPORATION

AUTHORIZED COMMON SHARES: 55,000,000          PAR VALUE: $.001 PER SHARE

CUSIP NO. 44920A 10 5

SL- 000214

214

813-079450

THIS CERTIFIES THAT

MICHAEL BALL
695 SOUTHWEST 36TH TERRACE
PALM CITY                    FL 33490

IS THE RECORD HOLDER OF     **TWO HUNDRED THOUSAND**

*****200000**

Shares of common stock of IBAC CORPORATION

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate property endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:     11-26-97

SECRETARY

RESTRICTED STOCK

PRESIDENT

Countersigned:
ATLAS STOCK TRANSFER CORPORATION
5899 South State St
Salt Lake City, Utah 84107

By:
Registrar-Authorized Signature

DENNIS + KATHREN KLINGER

Dianne Johnson
Trustee
For Johnson Family Trust
511 SW Bay Pointe Circle
Palm City, Florida 34990
561-286-0886

June 15, 1998

Stephen C. Or Iris Adler
4426 SW Oakhaven Lane
Palm City, FL 34990

RE: Request to transfer shares of IBAC Corporation, a Nevada Corporation
(the public "Company"- ICAN - OTC - Bulletin Board)

Dear Beneficiary:

Please find attached the letter of consul, whereby stock held for you by the above referenced trust may be transferred to you November 27, 1998. We believe your stock in the amount of _____10,000_____ shares will be free trading at that time, since the one year holding period will have been met on that date. Also enclosed are copies of certificates no.209 and no.210 held by the trust in the amount of 900,000 shares.

Thank you.

Yours truly,

Dianne Johnson
Trustee

DJ:nlb

**EXHIBIT "6"**

LEONARD W. BURNINGHAM
LAWYER
HERMES BUILDING · SUITE 205
455 EAST FIFTH SOUTH
SALT LAKE CITY, UTAH 84111-3323
TELEPHONE (801) 363-7411
FAX (801) 355-7126
e-mail lwb@burninglaw.com

June 3, 1998

George A. Janke

Facsimile No. 561-625-4989

Warren D. Johnson, Jr.

Facsimile No. 561-286-9508

Re:     Request to transfer shares of IBAC Corporation, a Nevada
        corporation (the "Company")

Dear Gentlemen:

I do not believe the requested transfers of Diane Johnson respecting the Company can be made under the so called 4(1)(1/2) exemption, and I have enclosed research in this respect.

Basically, the sale to more than a few persons is in effect a taking with a view of distribution, unless Ms. Johnson has satisfied the minimum one year holding period.

Thank you.

Yours very sincerely,

Leonard W. Burningham

LWB



RESTRICTED STOCK

NOT VALID UNLESS COUNTERSIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF NEVADA

SI— 000210

IBAC CORPORATION

AUTHORIZED COMMON SHARES: 50,000,000          PAR VALUE: 0.001 PER SHARE

CUSIP NO. 44624 10 6

813-467620

THIS CERTIFIES THAT

DIANE JOHNSON TYEE
FOR JOHNSON FAMILY TRUST
511 SW BAY POINT CIRCLE
PALM CITY          FL 34990

IS THE RECORD HOLDER OF      **FOUR HUNDRED FIFTY THOUSAND**

Shares of common stock of IBAC CORPORATION

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate
properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:   11-26-97  *R*

SECRETARY

RESTRICTED STOCK

IBAC CORPORATION
CORPORATE
Seal
NEVADA

PRESIDENT

Countersigned:
ATLAS STOCK TRANSFER CORPORATION
5899 South State St.
Salt Lake City, Utah 84107

By: Lynda Rowley
Registrar Authorized Signature



RESTRICTED STOCK

IBAC CORPORATION

AUTHORIZED COMMON SHARES: 50,000,000     PAR VALUE: $.001 PER SHARE

SL— 000209

CUSIP NO. 44694 10 8

THIS CERTIFIES THAT

IS THE RECORD HOLDER OF    **FOUR HUNDRED FIFTY THOUSAND**

DIANE JOHNSON TTEE
FOR JOHNSON FAMILY TRUST
511 SW BAY POINT CIRCLE
PALM CITY          FL 34990

B13-467620

Shares of common stock of IBAC CORPORATION

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:   11-26-97  *R*

SECRETARY

RESTRICTED STOCK

PRESIDENT

IBAC CORPORATION
CORPORATE
Seal
NEVADA

Countersigned:
ATLAS STOCK TRANSFER CORPORATION
5899 South State St.
Salt Lake City, Utah 84107

By: Linda Rowley
Properly Authorized Signature

STATE OF INDIANA )   IN THE ALLEN SUPERIOR COURT
                 )
COUNTY OF ALLEN  )   CAUSE NUMBER 02D01-9904-CP-  839
                 )

CHARLES CHAFFEE;              )
KAREN CHAFFEE; and            )
CLIFFORD CHAFFEE,             )
                             )
          Plaintiffs          )
                             )
     v.                       )
                             )
DIANNE JOHNSON, individually; )
WARREN D. JOHNSON, JR.,       )
individually;                 )
DIANNE JOHNSON, as Trustee    )
of the Johnson Family Trust; and )
JOHNSON FAMILY TRUST,         )
                             )
          Defendants          )

## C O M P L A I N T

### Count I:

### For Damages on Rescission

Plaintiffs, for their Count I claim, herein allege:

1.   Plaintiffs, Charles Chaffee and Karen Chaffee, are husband and wife.

2.   Plaintiffs, Charles Chaffee and Karen Chaffee, are presently residents of Florida.  However, at times past, and at the inception of the transactions hereinafter set forth, said Plaintiffs were residents of Indiana and Florida, and were frequently in Indiana where they had business and family ties.

3.   The Plaintiff, Clifford Chaffee, is the brother of Plaintiff, Charles Chaffee, and is a resident of Florida.

4.     The Defendants, Dianne Johnson and Warren D. Johnson, Jr., are husband and wife, and are residents of Florida.

5.     Defendant, Dianne Johnson, is and at all material times was or purported to be the Trustee of the Johnson Family Trust.

6.     The Johnson Family Trust is, upon information and belief, an ostensible inter vivos trust, created by Defendants, Dianne Johnson and Warren D. Johnson, Jr., through which the Johnsons conduct their business and affairs.

7.     The Defendants, Dianne Johnson and Warren D. Johnson, Jr., exercise and have direct or indirect control over the Johnson Family Trust.

8.     IBAC Corporation is an Arizona corporate entity.

9.     In approximately November, 1997, IBAC Corporation issued in excess of 900,000 shares of its common stock to Johnson Family Trust and/or to Dianne Johnson as Trustee of said Trust.

As issued, the shares of IBAC Corporation stock held by the Johnson Family Trust were "restricted stock" and the same could not be lawfully offered and sold to others without the removal of such "restrictions" as applied thereto.

10.     In the fall of 1997, the Defendants, Dianne Johnson and Warren D. Johnson, Jr., acting for themselves and as agents of the Johnson Family Trust, approached Plaintiffs and sought to interest Plaintiffs in purchasing from the Johnson Family Trust some of the "restricted" shares of IBAC Corporation stock which were held by said Trust.

2

To induce the Plaintiffs to purchase said stock, Defendants represented to Plaintiffs that the "restriction" on the transferability of said stock was a one (1) year restriction and that, upon the expiration of such one (1) year, the stock would become "free trading."

11.   In reliance on the representations of Defendants, the Plaintiffs agreed to purchase from Defendants, shares of IBAC Corporation stock, with the understanding that Defendants would make actual delivery of such stock in the summer or fall of 1998, upon the expiration of such one (1) year period of "restriction."

12.   The Plaintiffs, Charles Chaffee and Karen Chaffee, paid or caused to be paid to Defendants the sum of $53,000.00 to purchase 53,000 shares of IBAC Corporation stock from the Johnson Family Trust. The Plaintiff, Clifford Chaffee, paid to Defendants the sum of $25,000.00 to purchase 25,000 shares of IBAC Corporation stock from the Johnson Family Trust.

13.   Upon expiration of the one (1) year period of time, the Defendants failed to deliver to Plaintiffs or Plaintiffs' designees the "unrestricted" shares of IBAC Corporation stock as Defendants had represented and promised would be done. Thereupon, Plaintiffs elected to rescind their purchases and made due demand for refund of their purchase prices paid to Defendants.

14.   The Defendants have failed and refused to refund to Plaintiffs their purchase prices paid for such stock.

**WHEREFORE**, Plaintiffs pray:

1.     For a judgment in favor of Plaintiffs, Charles Chaffee and Karen Chaffee, and against Defendants, jointly and severally, in the amount of $53,000.00, plus statutory interest;

2.     For a judgment in favor of Plaintiff, Clifford Chaffee, and against Defendants, jointly and severally, in the amount of $25,000.00, plus statutory interest; and

3.     For the costs herein taxable by law.

## Count II:

## Rescission Under Indiana Securities Act

Plaintiffs, for their Count II claim, herein allege:

1.     Plaintiffs incorporate here Paragraphs 1 through 14 of Count I.

2.     The stock of IBAC Corporation which Defendants offered and sold to Plaintiffs were a "security" as such term is defined in Ind. Code § 23-2-1-1.

3.     The offer and sale of the stock of IBAC Corporation to Plaintiffs by Defendants was subject to the Indiana Securities Act in that, *inter alia*:

(A)     The Defendants made the representations to Plaintiffs which induced Plaintiffs' purchases, directly or indirectly, by communications sent to Plaintiffs in or through Indiana;

(B)     Payment for the purchased shares was made to Defendants from Indiana; and

(C)     Delivery of the stock was to be made, at least in substantial part, in Indiana.

4.     The shares of IBAC Corporation stock which Defendants sold to Plaintiffs were not registered under the Indiana Securities Act and, hence, the offer and sale of such stock was made in violation of Ind. Code § 23-2-1-3.

5.     In connection with the offer and sale of such stock to Plaintiffs, Defendants made one or more false and misleading statements concerning the duration, effect and removal of the "restriction" on transferability and, hence, the offer and sale of such stock to Plaintiffs by Defendants was made in violation of Ind. Code § 23-2-1-12.

6.     The Plaintiffs first learned of the falsity of the Defendants' statements concerning the "restrictions" in the fall of 1998.

7.     The Defendants, Dianne Johnson and Warren D. Johnson, Jr., were agents of the Johnson Family Trust and they materially aided in the sale by the Trustee to Plaintiffs.

8.     Pursuant to Ind. Code § 23-2-1-19, the Defendants are liable to Plaintiffs in statutory restrictions; are liable to Plaintiffs to refund Plaintiffs' purchase prices, with statutory interest and reasonable attorneys' fees.

**WHEREFORE**, Plaintiffs pray:

1.     For a judgment in favor of Plaintiffs, Charles Chaffee and Karen Chaffee, and against Defendants, jointly and severally, in the amount of $53,000.00, plus statutory interest;

2.     For a judgment in favor of Plaintiff, Clifford Chaffee, and against Defendants, jointly and severally, in the amount of $25,000.00, plus statutory interest; and

3.    For an award of reasonable attorneys' fees in the sum of $25,000.00 or such other sums as the Court deems proper.

### Count III:

### For Damages Upon Rescission Under the Florida Securities Act

Plaintiffs, for their Count III claim, allege:

1.    Plaintiffs here incorporate by reference Paragraphs 1 through 14 of Count I above.

2.    The stock of IBAC Corporation which Defendants offered and sold to Plaintiffs was a "security" as defined in Section 517.021 of the Florida Securities Act.

3.    The offer and/or sale of the stock by Defendants to Plaintiffs is within the Florida Securities Act in that, *inter alia*:

    (A)    Plaintiffs paid the purchase price to Defendants in Florida;

    (B)    Defendants were to deliver the purchased stock to Plaintiffs, at least in part, in Florida; and

    (C)    Defendants made one or more communications to Plaintiffs to induce Plaintiffs' purchases in Florida.

4.    The stock of IBAC Corporation which Defendants offered and sold to Plaintiffs was not registered under the Florida Securities Act and, hence, its offer and sale to Plaintiffs was in violation of F.S.A. § 517.07.

5.    The Defendants made one or more false and misleading statements of material facts to induce Plaintiffs' purchases of the stock, including false and misleading statements as to the extent, duration and removal of the "restrictions" and, hence,

6

Defendants' offer and sale of such stock to Plaintiffs was made in violation of F.S.A. § 517.301.

6.      By virtue of the facts hereinabove set forth, Defendants are liable to Plaintiffs under F.S.A. § 517.211.

**WHEREFORE**, Plaintiffs pray:

1.      For a judgment in favor of Plaintiffs, Charles Chaffee and Karen Chaffee, and against Defendants, jointly and severally, in the amount of $53,000.00, plus statutory interest;

2.      For a judgment in favor of Plaintiff, Clifford Chaffee, and against Defendants, jointly and severally, in the amount of $25,000.00, plus statutory interest; and

3.      For an award of reasonable attorneys' fees in the sum of $25,000.00 or such other sums as the Court deems proper.

ROTHBERG & LOGAN

By _____
Martin T. Fletcher, Sr.,
Indiana Supreme Court #6908-02

Suite 2100, 110 West Berry Street
Post Office Box 11647
Fort Wayne, Indiana 46859-1647
Telephone:   (219) 422-9454

In consideration for the disclosure of Confidential Information for the purpose of evaluating a proposed joint venture. I. Ron Francis, hereby agree individually and as a representative of SEARS OIL COMPANY, ("SEARS") that all Confidential Information provided to me by ICE BAN USA, INC., ("ICE BAN") will be kept in confidence and trust according to the terms and conditions of this Agreement as follows:

1.     **Obligation to Keep Secret.**  Confidential Information shall be kept secret and held in the strictest possible confidence by SEARS and shall not be disclosed to any other person, entity or third party without the prior written consent of ICE BAN.

2.     **Limited Use of Confidential Information.**     Confidential Information shall be used only for the purpose of evaluating a possible business relationship and for that purpose, may only be disclosed to other managerial employees or directors of SEARS who have a clearly definable need-to-know. With respect to Confidential Information which is covered by copyrights, a limited and reasonable number of copies of written materials covered by such copyrights, excluding machine readable data, may be made to adequately use such Confidential Information within the terms and conditions of this Agreement, provided that all confidential or proprietary legends and notices located on the original documents are also reproduced on such copies and that each copy is treated as an original in accordance with this Agreement. Upon request and within seven (7) days thereafter, a list of those individuals which have had access to such Confidential shall be provided.

3.     **Definition of Confidential Information.**  Confidential Information shall be defined as information which is disclosed by any means and for any reason relating to this Agreement including:

a)     Information, whether tangible or not, that has been created, discovered, or developed by ICE BAN and which may be proprietary to ICE BAN including any patent applications, trade secrets, processes, formulae, experimental designs, results, and conclusions, technological data and know-how. improvements, inventions, techniques, planned products, research and development, marketing plans, business plans, strategies, forecasts, customer lists, confidential information about finances, marketing, pricing, costs and compensation structures;

b)     Information that is in written, tabulated, graphic, machine readable or other tangible form, including experimental designs, results and conclusions, technological data and know-how, designs, memoranda, models, prototypes, and any other tangible information;

c)     Information that is furnished orally or in other non-tangible means, if it is confirmed as being Confidential Information by ICE BAN in a written instrument

**EXHIBIT "7"**

FC·33

delivered within thirty (30) days after such delivery,
used to identify such orally delivered information as being Confidential Information at the time of oral delivery. Any such confirmatory instrument shall summarize the relevant Confidential Information and the date of its oral delivery and refer to this Agreement; and

   d)   Information that is reasonably determined from other information supplied or from reasonable inspection thereof to be foreseeably expected to be Confidential Information as defined herein.

   **4.   Exceptions to Confidential Information.**   The confidentiality and limited use obligations of this Agreement shall not apply to information received pursuant to this Agreement which:

   a)   Is generally known and available in the public domain at the time it was disclosed or becomes generally known and available in the public domain through no fault of SEARS;

   b)   Is known to SEARS at the time of disclosure as shown by documentation which was prepared contemporaneously with the receipt or creation of that information; or

   c)   Is or becomes known to SEARS from a source other than ICE BAN without breach of an obligation of confidentiality and otherwise not in violation of ICE BAN's rights.

   **5.   Ownership.**   Confidential Information shall be considered the exclusive property of ICE BAN.   Confidential Information is subject to all relevant intellectual and/or proprietary property rights of ICE BAN now owns or may hereinafter acquire, including the relevant laws governing patents, designs, trademarks, copyrights, trade secrets and unfair competition.

   **6.   Return of Confidential Information.**   Upon the expiration of this Agreement or a determination to discontinue the proposed business relationship, or upon the earlier request of ICE BAN, SEARS shall, at its own expense, promptly return to ICE BAN all originals and all copies of documents and other information that were disclosed.

   **7.   Term and Termination of Agreement.**   This Agreement shall become effective upon the date of execution below and shall remain in effect for THREE (3) years thereafter.

FN _ 22

3. No later than Trademark or other exercise Grantor. except .

expressly, impliedly or otherwise, any licenses or other rights under any patent, trademarks or any other intellectual and/or proprietary rights which ICE BAN now owns or may later acquire

## AGREED TO and ACCEPTED by and for SEARS OIL COMPANY:

_[signature]_           Date: _10/3/97_

Ron Francis, individually and as

_Treasurer_ of Sears Oil Company

** TOTAL PAGE.05 **

FC-33

 **IBAC CORPORATION**



April 12, 1999

David J. Feingold
Feingold and Kam
3300 PGA Blvd., Suite 410
Palm Beach Gardens, FL 33410

Dear Mr. Feingold:

Pursuant to Florida Statute 517.211, IBAC Corporation does hereby offer to take back its securities, the subject of Civil Action Case Number 99-8228 CIV-MIDDLEBROOKS, (Magistrate Judge Garber) in exchange for the full amount paid by your clients (the Plaintiffs in the federal case referenced supra) plus interest on the full amount paid for said securities at the legal rate pursuant to s.5503 for the period from the date of payment by the purchasers to the date of closing.

I would suggest that a closing be held at the office of Thomas F. Ryan, P.A., 14041 US Hwy 1, Ste E, Juno Beach, Florida at your earliest convenience.

If you have any questions, do not hesitate to contact Thomas F. Ryan, Esq. at (561) 694-6945, who has been retained by IBAC Corporation to defend the federal case referenced supra.

Sincerely,

IBAC Corporation

George A. Janke
President

GAJ/klw

Cc: Dianne Johnson
511 SW Bay Point Cr.
Palm City, FL 54990

**EXHIBIT "A"**

AKERMAN, SENTERFITT & EIDSON, P.A.

ATTORNEYS AT LAW

PHILLIPS POINT EAST TOWER
SUITE 600
77/ SOUTH FLAGLER DRIVE
WEST PALM BEACH, FLORIDA 3340I
(561) 650 9590
FACSIMILE (56I) 659-6313

July 22, 1999

**Via Fax and U.S. Mail**

David J. Feingold
Feingold & Kam
3300 PGA Boulevard, Suite 410
Palm Beach Gardens, FL 33410

RE:   United States District Court Case No. 99-8228-CIV-RYSKAMP
      Dianne Johnson, et al v. Ice Ban America & IBAC Corporation

Dear Mr. Feingold:

Pursuant to Florida Statute §517.211, Ice Ban America, Inc. does hereby offer to take back certain securities, the subject of the above referenced civil action in exchange for the full amount paid by your clients (the Plaintiffs in this case), for the founders stock issued initially to Warren Johnson, Jr. in August 1996, and currently held as follows:

| Names | Shares | Initial Cost |
|-------|--------|--------------|
| Medical College Fund, Ltd. | 700,000 | $700.00 |
| Windmills Plantation Fund Ltd. | 625,000 | $625.00 |
| Hawk's Nest Plantation Fund, Ltd. | 600,000 | $600.00 |
| Reed International Fund, Ltd. | 750,000 | $750.00 |
| Ryder Securities, Ltd. | 750,000 | $750.00 |
| Marlin Preservation Fund, Ltd. | 500,000 | $500.00 |
| Adam Brown | 150,000 | $150.00 |
| Harvard Fund, Limited | 260,000 | $260.00 |
| Johnson Family Athletic Foundation | 10,000 | $ 10.00 |
| Dianne Johnson | 200,000 | $200.00 |
| Merchant Trust Fund, Limited | 260,000 | $260.00 |
| Merchants Fund, Ltd. | 100,000 | $100.00 |
| Burton Wickham | 50,000 | $ 50.00 |

WP025685.1

**EXHIBIT "9"**

David J. Feingold
July 22, 1999
Page 2

plus interest on the full amount paid for said securities at the legal rate pursuant to Fla. Stat. §55.03 for the period from the date of payment by the purchasers to the date of closing. This offer excludes the restricted stock obtained by your clients in the purchase of Ice Ban, Inc.

I would suggest that a closing be held at the offices of Akerman, Senterfitt & Eidson at Phillips Point-East Tower, 777 Flagler Drive, Suite 900, West Palm Beach, Florida at your earliest convenience.

If you have any questions, please do not hesitate to contact me at (561) 659-5990.

Very truly yours,

James M. McCann, Jr.
For the Firm

JMM:mll

cc:     Medical College Fund, Ltd.
        Windmills Plantation Fund Ltd.
        Hawk's Nest Plantation Fund, Ltd.
        Reed International Fund, Ltd.
        Ryder Securities, Ltd.
        Marlin Preservation Fund, Ltd.
        Adam Brown
        Harvard Fund, Limited
        Johnson Family Athletic Foundation
        Dianne Johnson
        Merchant Trust Fund, Limited
        Merchants Fund, Ltd.
        Burton Wickham

WPO23685.1